385 F.2d 629
 CITY OF CHICAGO, a Municipal Corporation of the State of Illinois, and
Public Service Commission of the State of Wisconsin, Petitioners,
v.
FEDERAL POWER COMMISSION, Respondent,
Natural Gas Pipeline Company of America, Intervenor.
NATURAL GAS PIPELINE COMPANY OF AMERICA, Petitioner,
v.
FEDERAL POWER COMMISSION, Respondent.
 No. 19604.
 No. 19836.
 United States Court of Appeals District of Columbia Circuit.
 Argued October 28, 1966.
 Decided September 8, 1967.
 As Amended October 31, 1967.
 Petition for Rehearing Denied October 31, 1967.
 
 COPYRIGHT MATERIAL OMITTED Mr. Mathias M. Mattern, Chicago, Ill., of the bar of the Supreme Court of Illinois, pro hac vice, by special leave of court, with whom Mr. William T. Torkelson, Madison, Wis., was on the brief, for petitioners in No. 19,604.
 Mr. William W. Brackett, Chicago, Ill., for petitioner in No. 19,836.
 Mr. Peter H. Schiff, Deputy Sol., F. P. C., with whom Messrs. Richard A. Solomon, Gen. Counsel, Howard E. Wahrenbrock, Sol. at the time of argument, and Abraham R. Spalter, Asst. Gen. Counsel, F. P. C., were on the brief, for respondent.
 Before BURGER, TAMM and LEVENTHAL, Circuit Judges.
 LEVENTHAL, Circuit Judge:
 
 
 1
 This case presents a cluster of issues concerning the proper treatment, for purposes of regulation by the Federal Power Commission of the rates of natural gas pipeline companies, of the higher deductions permitted in calculation of Federal income tax by the liberalized depreciation provisions of Section 167 of the Internal Revenue Code of 1954.[1] In addition to questions of general approach there are particular issues as to the effect of a rate settlement agreement.
 
 
 2
 I Procedural History.
 
 
 3
 The controversy before us began when rate increases were filed in 1960 by Natural Gas Pipeline Company (Natural),[2] the petitioner in No. 19836. On Natural's motion in the ensuing proceeding under Section 4(e) of the Natural Gas Act,[3] the increased rates were put into effect on March 1, 1961, after the statutory suspension period expired, subject to Natural's obligation to make such refunds as the Commission might validly order. After a full hearing was had, but before briefs were submitted to the examiner, Natural, its customers, the City of Chicago (Chicago) and the Wisconsin Public Service Commission (Wisconsin), and the Commission staff, agreed upon a rate settlement. The customers agreed to accept an increase in rates yielding approximately $6,200,000 per annum, about half the increase Natural had proposed, and Natural agreed to refund amounts already collected above the agreed-upon increase.
 
 
 4
 The settlement left open two questions for future determination, one of which relates to liberalized depreciation, and Natural agreed to abide by a Commission refund order "if any" with regard to the reserved issue, subject to its right to judicial review. On October 25, 1962, the Commission approved this settlement.[4]
 
 
 5
 On February 3, 1964, the Commission issued Opinion 417, Alabama-Tennessee Natural Gas Co.,[5] wherein it announced principles concerning rate treatment of liberalized depreciation, and the City of Chicago then moved the Commission to decide the liberalized depreciation issue with respect to Natural. On March 18, 1965, the Commission issued its Opinion 456,[6] concluding that the principles of Alabama-Tennessee were applicable to Natural and making certain other rulings with respect to effective date and settlement agreements that will be discussed in due course.
 
 
 6
 Petitions for rehearing were filed and denied, and petitions for review under Section 19(b) of the Natural Gas Act[7] were filed both by Chicago and Wisconsin as joint petitioners in No. 19604, and by Natural in No. 19836.
 
 
 7
 Consideration by this court was deferred pending judicial review of the Commission's Alabama-Tennessee decision. That decision was affirmed by the Fifth Circuit in Alabama-Tennessee Natural Gas Co. v. FPC, 359 F.2d 318 (1966). The Supreme Court denied certiorari, 385 U.S. 847, 87 S.Ct. 69, 17 L.Ed.2d 78 (1966).
 
 
 8
 II The Validity of the Commission's Requirement for "Flow Through" to Consumers of the Tax Reductions Achieved by Natural Through Use of Liberalized Depreciation.
 
 
 9
 1. The Federal Power Commission, with judicial approval, has been engaged under the Natural Gas Act in regulating the maximum rates of natural gas pipeline companies by permitting rates that will yield operating revenues sufficient to cover "cost of service," a term that in essence includes, in addition to operating costs, depreciation, etc., the "return" to the company which the Commission calculates by providing a fair rate of return on a rate base equal to the amount prudently invested in utility property, and the "expense" of Federal income tax payable on the allowed return.[8] The objective is to allow a fair profit, after taxes, ascertained after taking into account "a variety of factors, such as the risks of the business, the necessity for attracting capital, and the desirability of lower cost of gas to the public."[9]
 
 
 10
 2. Focusing on the income tax element this is regarded by regulatory commissions as part of the "cost" of service, a terminology in line with the general thinking of businessmen, although for various purposes economists and accountants draw a distinction between tax burden and cost. The difference is largely one of nomenclature since in any event it is necessary to provide, obtain or permit revenues after taxes that are sufficient to cover all costs other than taxes.
 
 
 11
 The general rule followed by the Commission, and indeed most if not all regulatory commissions, is that the "consumers should be charged for only the actual liability for Federal income taxes."[10] However, as the Commission pointed out, in some cases normalization of tax deferrals is required lest future consumers be compelled to subsidize present consumers being served by the operations accruing tax liabilities. The specific question of the proper regulatory treatment of the liberalized depreciation tax deduction is one on which the regulatory commissions are nearly equally divided.
 
 
 12
 A bare majority use the so-called "normalization" method by which the tax expense component of cost of service is calculated by using the higher income tax that would have been payable if depreciation were calculated on the "straightline" method almost universally utilized for tax purposes prior to the 1954 Code, without reduction for the amount of "deferred" taxes carried in a tax reserve on the books in contemplation of the future tax obligation. This approach focuses on the current tax reduction achieved by the utility as a tax "deferral," with liberalized deduction providing higher depreciation deductions and hence lower taxes in the early part of the property's usable life, and of lower deductions and higher taxes in later years.
 
 
 13
 The rejection of the normalization approach by respondent Commission, and others, rests on the view that the deferral conception is inappropriate in the absence of a reasonably foreseeable decline in depreciable plant account, and hence is inapplicable where a growing or stable plant is ascertainable for the foreseeable future. In Alabama-Tennessee the Commission determined that the deferral conception was inapplicable in view of the factual condition of growing or stable plant for the foreseeable future, a condition found to exist in general for the natural gas industry and natural gas pipeline companies. The finding of this condition followed a review of forecasts for energy supply and demand and other pertinent economic data, a forecast of continuous growth characteristics for the industry for some time, albeit at a more modest rate than the dramatically steep incline that has marked the industry in the post-war decades, and a relative assurance of at least stable plant for the foreseeable future.
 
 
 14
 In Alabama-Tennessee the Commission rejected normalization for the natural gas industry in general, but left open the possibility that a different ruling might be applicable to a particular company that showed its condition was different from the industry's in this regard. No such showing was attempted by Natural, and there is no serious effort in this case to dispute the factual finding underlying the flow-through determination, similar to that made for the company in Alabama-Tennessee, that "Natural will maintain a growing or stable plant for the foreseeable future."
 
 
 15
 3. We follow the decision of the Fifth Circuit in Alabama-Tennessee which sustained the Commission's findings as reasonable and supported by evidence and upheld the general validity and particular application of the policy determination requiring "flow-through" of the tax reduction ascribable to liberalized depreciation. Although in general the denial of certiorari is said to import no conclusion on the merits, it is not insignificant that in Alabama-Tennessee the writ was denied notwithstanding the concession of the Solicitor General that an important recurring question was involved.
 
 
 16
 In any event, Alabama-Tennessee is plainly in line with the principles expressed in FPC v. United Gas Pipe Line Co., 386 U.S. 237, 87 S.Ct. 1003, 18 L.Ed. 2d 18 (1967). In that case the Court held that where affiliated companies obtain a tax saving through consolidated returns, a regulatory commission can flow through the amount it calculates, by a reasonable allocation, to be the tax saving of a regulated company within the affiliated group. The Court pointed out that the tax law does not attempt to set rates, and stated (at 244-245, 87 S.Ct. at 1007):
 
 
 17
 [W]hen the out-of-pocket tax cost of the regulated affiliate is reduced, there is an immediate confrontation with the ratemaking principle that limits cost of service to expenses actually incurred. Nothing in Colorado Interstate [Colorado Interstate Gas Co. v. FPC, 324 U.S. 581, 65 S.Ct. 829, 89 L.Ed. 1206] or Panhandle [Panhandle Eastern Pipe Line Co. v. FPC, 324 U.S. 635, 65 S.Ct. 821, 89 L.Ed. 1241] forbids the Commission to recognize the actual tax saving impact of a private election to file consolidated returns. On the contrary, both cases support the power and the duty of the Commission to limit cost of service to real expenses. [Footnote omitted.]
 
 
 18
 While Natural's contentions to this court are for the most part disposed of by the court's decision in Alabama-Tennessee, some supplementary comments may be appropriate. First, we note that it is in the tradition of sound regulation for a commission to develop doctrines, as respondent Commission has done, that are attuned to its growth forecast.[11] Indeed, it is this factual experience of renewal of capital investment that has undercut the objections of theory, once expressed by natural gas companies, that the Commission's use of prudent rate base and deduction of depreciation reserves would lead in time to the absurdity of a "vanishing rate base" and zero return.[12] Similarly here the factual projection of capital investment undercuts the objection grounded on the theoretical point that the flow-through approach exposes a company to the risk of a future tax bill without the comfort of a tax reserve.
 
 
 19
 Given the premise of a growing or stable plant, there is no basis for our rejecting as arbitrary the Commission's conclusion that the utility will obtain a continuing tax reduction from liberalized depreciation. That proposition, noted in publications,[13] and presented in this record, as in the Alabama-Tennessee record, through the testimony of Mr. Melwood Van Scoyoc, as a witness for intervenors, is essentially demonstrable as a matter of mathematics. The critical point is that whereas tax "deferral" is the correct analysis when only a single unit of property is involved, when the procedure is applied to "property comprised of a large number of units as is characteristic of utility plant,"[14] typically with different vintages, depreciated through use of "average service life" experience, composite depreciation on total plant will exceed straight line composite depreciation as long as total dollar amount of gross composite plant (before depreciation) remains at least stable, since the depreciation on older assets that is below normal "is counterbalanced by `above normal' depreciation on new assets."[15]
 
 
 20
 Natural's primary emphasis is on the legislative intention it gleans from the tax statute. What Congress provides in a tax statute does not necessarily control in the implementation of federal regulatory statutes. See FPC v. United Gas Pipe Line Co., supra. In Alabama-Tennessee, after reviewing the legislative history at length after contrasting the Congressional silence on the liberalized depreciation issue with the precise language used in the provision of the tax statute that expressly restricted the rate-making authority of federal regulatory agencies to reduce the federal income tax component of cost of service by the amount of the investment tax credit,[16] and after projecting as well as it could how the legislature would have dealt with the concrete situation if it had but spoken,[17] the Fifth Circuit concluded (359 F.2d at 335):
 
 
 21
 Given the long reach of the Natural Gas Act, as liberally interpreted by the Supreme Court, and weighing the consumer-oriented objectives of that Act against the Section 167 objective of promoting plant expansion by postponing the timing of tax payments, we conclude: It is unlikely to suppose that Congress amended the Natural Gas Act by a reference in the Internal Revenue Code; it is unreasonable to read Section 167 as a mandate reducing the Commission's responsibility to fix fair rates according to its usual ratemaking policies in favor of the consumer. * * * [We] infer that its [Congress'] decision not to disturb, in terms, the status quo of ratemaking indicates a congressional intent that each federal regulatory agency should continue to exercise an informed discretionary authority in accordance with the agency's usual standards in the light of the needs peculiar to the particular industry subject to rate regulation.
 
 
 22
 The fact that the tax statute is not controlling does not necessarily end the matter. A regulatory agency may, should, and in some instances must, give consideration to objectives expressed by Congress in other legislation,[18] assuming they can be related to the objectives of the statute administered by the agency.[19] Here, however, the Commission did give consideration to the Congressional objective of stimulating investment. It pointed out that the major expenditures by natural gas pipelines result from system expansion to serve additional loads, and technological obsolescence has not been a large investment factor; that lower rates tend to generate higher volume and thus ultimately to require expansion; that natural gas pipelines have no need for the additional capital provided by tax reserves to finance expansion in view of the regulatory principles under which rate of return is established so as to attract new capital and there is provision for adequate working capital allowance in the rate base; and that there is no indication that pipelines will have any problem financing the moderate expansion expected in the near future, especially in view of the tremendous expansion financed in the past two decades at a cost of over $9 billion. The Commission applied to Natural its rationale in Alabama-Tennessee "that flow-through and lower rates are a more effective stimulus to new investment than normalization"; and Natural does not contend that if it be assumed that the approach is sound for the natural gas pipeline industry generally it is not properly applicable to Natural.[20]
 
 
 23
 Natural's position is that the Commission is required not only to further the Congressional objective of enhancing investment, but to adopt the method prescribed by Congress for achieving that objective, and that Congress sought economic stimulus through the technique of providing current investment funds and not through the technique of tax reduction. We do not read the legislative history as indicating that Congress would have felt frustrated if producers in a competitive industry decided to treat the liberalized depreciation as in effect a tax reduction and to lower prices in contemplation of increasing sales and capital investment. The regulation of companies protected from free competition may properly be conducted so as to seek the kind of service and price reductions that would have been achieved under free competition — assuming the utility is not deprived of a fair return.[21] In any event, we agree with the conclusion of the Fifth Circuit that the courts are not in a position to choose between economic theories or to mandate the particular technique espoused by Natural as the plainly ascertainable will of Congress.
 
 
 24
 4. Natural says that the Commission has been treating the courts as "rubber stamps," stating in its brief: "It has repeatedly changed its position and each time it has ignored prior judicial holdings, apparently confident that it will be upheld in its new-found reversible exercise of `expertise.' If the Commission can successfully do this — if its decisions can be relied upon only until the composition of the Commission changes and a different social philosophy gains control — and can secure judicial approval each time it switches position, then Natural submits that judicial review has lost its meaning."
 
 
 25
 In reply, respondent's brief retraces the Commission's steps and argues that they were responsive to growing appreciation of the consequences of the normalization approach and to new judicial indications of the range of discretion available to the Commission. Natural disputes the reading of pertinent decisions both by the Commission and in the Alabama-Tennessee decision of the Fifth Circuit. So far as our own decisions go, it may be observed that in 1955 City of Detroit, Mich. v. Federal Power Commission,[22] upheld, as the result intended by Congress, the Commission's normalization approach to the accelerated amortization applicable under the 1950 Code to particular national defense facilities. The Commission's 1956 Amere decision[23] assumed that City of Detroit governed liberalized depreciation, notwithstanding the fact that the accelerated amortization provisions were concerned with particular units of plan, and did not involve the entirety of new plant covered by liberalized depreciation, which assures and generalizes the savings effect related above.
 
 
 26
 Our 1963 en banc decision in Panhandle Eastern Pipe Line Co. v. Federal Power Commission,[24] limited the scope of this part of City of Detroit when the court approved the 1961 determination of the Commission, faced with the mounting accumulations of tax deferrals under the normalization policy, that limited the rate of return on this part of rate base to only 1.5%. The indications of agency discretion in the majority opinion[25] were relied upon by the Commission as a recognition of its authority when it acted within a year to reject completely the "normalization" approach.
 
 
 27
 The Rule of Law does not forbid an agency from modifying its regulatory policy, and the courts have upheld policy revision many times.[26] Indeed one of the signal attributes of the administrative process is flexibility in reconsidering and reforming of policy. What is required by the Rule of Law is that agency policies and standards, whether or not modifications of previous policies, be reasonable and non-discriminatory, and flow rationally from findings that are reasonable inferences from substantial evidence.
 
 
 28
 There is perhaps one additional requirement inserted in case of a change in policy, that the agency give due consideration to the equities, if any, arising out of commitments based on previous rulings.[27]
 
 
 29
 The possibility that changes in policy and viewpoint may come with changes in membership is inherent in an agency's characteristic as an institution headed and staffed by human beings, and will not come as a surprise to any observer of the administrative process.[28] Sometimes indeed an industry resists renomination of a commissioner precisely to obtain a change in policy. It is not necessarily invidious that a change in approach may reflect a change in personnel; indeed, it may well be a blessing rather than a vice that the rigidity of staff bureaucracy may be minimized by changes of agency membership that can initiate a fresh look at old problems, rather than a mechanical perpetuation of what has been done in the past. In any event, judicial review is not abdicated by a doctrine that accepts an agency discretion to change policies, but rejects rulings based on improper pressures on or even secret contacts with administrators,[29] the exercise of pure whim, or other irrational or arbitrary bases of decision.
 
 
 30
 Insofar as Natural relies on the inaction of Congress during the years of the Commission's normalization ruling, this does not significantly add to or subtract from the legislation as passed in 1954. Sometimes legislative inaction may be taken as acquiescence in the validity of executive or administrative action under an assumed power.[30] More rarely can it be taken as a prohibition where there has been executive inaction or delay in apprehending the scope and nature of the evil that is later considered to require attention in the public interest.[31]
 
 
 31
 We affirm the Commission's policy use of the "flow through" of the current tax reduction resulting from use of liberalized depreciation and its application of that policy in limitation of Natural's rate increase.
 
 
 32
 III Invalidity Under Settlement Agreement of the Commission's Deduction from Natural's Rate Base of Previously Accumulated Deferred Taxes.
 
 
 33
 The Commission, after concluding that Natural's condition was properly governed by the principles of Alabama-Tennessee, decided that as was done in that case "we shall provide for deduction of the accumulated reserves from the rate base." We think this action was precluded by its 1962 order approving the parties' Stipulation and Agreement to Terminate Proceedings, hereafter referred to as their Settlement Agreement.
 
 
 34
 In Alabama-Tennessee, after adopting the flow-through policy, the Commission turned to the existing accumulation of deferred tax reserves, and held they should be maintained as contingency reserves against the remote possibility that due to some improbable but conceivable combination of circumstances future ratepayers may be called upon to defray the cost of higher taxes attributable to the earlier use of liberalized depreciation. It concluded that since the accumulations will not be needed in the foreseeable future to defray any increase in taxes payable on earnings from properties used in rendering service, the balances "must now be regarded as consumer-contributed capital collected for a specific purpose of remote and improbable occurrence."[32]
 
 
 35
 The Commission formulated the policy, prospective in effect from the date of the order, that the rate of return on these balances should be zero, since no cost had been incurred in their accumulation, and it accordingly modified its policy of permitting gas pipeline companies to earn a 1.5% return on those balances.[33]
 
 
 36
 As to the general propriety of such an approach, assuming a flow-through policy, we agree with the Fifth Circuit's affirmance of this ruling in Alabama-Tennessee. We agree with Natural, however, that the Commission's application of this ruling to Natural was in excess of the question reserved for the Commission by the Settlement Agreement, which uses explicit and unambiguous language reserving only the question whether Natural should use "flow through" or "normalization" in computing its federal income tax expense allowance.[34] Opinion No. 367 approving the Settlement Agreement uses the same terminology, and makes no reference to other aspects of liberalized depreciation problem, such as effect on rate base or rate of return. Any adjustment in rate base or rate of return would affect the "return" component of the cost of service which is separate and distinct from the Federal Income Tax expense allowance. The difference between these two items is not recondite technicality; it is part of the basic vocabulary of all parties and counsel to a rate proceeding.[35]
 
 
 37
 In denying Natural's petition for rehearing the respondent Commission said that the determination of the issue whether Natural was properly subject to flow through "also involved, in our opinion, the proper treatment of the accumulated deferred taxes," since these reserves reflect the benefits of depreciation that had not been flowed through. We have no doubt that the two subjects are inter-related, as the discussion in Alabama-Tennessee makes clear, but we also have no doubt that they are two separate subjects, and that under the Settlement Agreement one was settled by the parties and one was reserved for Commission decision.
 
 
 38
 The case is governed by the need for construing settlement agreements in accordance with the specialized understanding of parties to a rate proceeding. There is little we can add to the Fifth Circuit's knowledgeable discussion of settlement agreements and their interpretation in Texas Eastern Transmission Corp. v. FPC, 306 F.2d 345 at 348 (5th Cir. 1962):
 
 
 39
 * * * [O]ne sure way to discourage voluntary settlements is for the Commission, at the behest of one party or the other, or the ubiquitous intervenors, to read into contracts things which are simply not expressed or not there, out of the thoroughly commendable (and understandable) feeling that unless that is done the result is not as good as it ought to have been. This is particularly true in this area where, as was the case here, the proposed settlement is subjected, as it should be, to the closest scrutiny by the Commission and its staff. It is more than arms' length. Overreaching is an impossibility. But precision is not merely a possibility. Precision is almost a certainty as skilled partisans undertake to hammer out the bargain under the ever-present watchful eye (and hand) of the independent agency as the guardian of the public interest. Consequently, both in its substantive provisions and in the terminology sought to memorialize the undertaking, the parties ought to be able to accept the contract as drafted, executed and approved. It should stand for what it says.
 
 
 40
 In construing the contract in accordance with its terms, and incidentally in a way that Chicago as well as Natural tells us is sound, we observe that this is not necessarily the perpetuation of an unintended and egregious mistake. We note that Mr. W. H. Beidatsch, the Commission staff witness, calculated that fair rate of return, was 6.28%, if the "capital obtained through the deferral of income taxes" is assumed to be "cost free," and 6.32% if a cost of 1.5% "is imputed to such capital." So the parties and staff were not unaware of the problem. And the City of Chicago in particular was presumably not unaware that only two years previously the Supreme Court of Illinois held that the state commission could in its discretion recognize deferred tax liability as a present expense, but could not fail to exclude from rate base the funds generated by accruing deferred tax expense.[36]
 
 
 41
 The Settlement Agreement says the agreement by the parties as to amount of cost of service, reached for purposes of settlement, "is not intended to reflect agreement to the amount, percentage or method or derivation of any particular item of such cost of service." It also expressly provides that it is without prejudice to the right of the parties hereafter to question in any other proceeding the propriety of any method or principle employed or the accuracy of any data used in connection with this settlement." These are important provisions. The parties may be disposed to avoid the expense and distractions of litigation if the various rates reached in a settlement do not constitute a binding admission or ruling on principle. But for purposes of considering whether it makes sense to construe the Settlement Agreement as written, it may be supposed that at least the intervenors and staff may have been satisfied that in their calculation the settlement was acceptable in that it essentially reflected a 1.5% rate of return for that part of capital composed of deferred tax accruals. Although this was no more than would have been required by the Commission's policy at the time, that policy was of only one year's standing, there was at least some question of its validity under the City of Detroit case, and it had not yet been affirmed by the 5-4 en banc decision which was issued by this court in 1963.[37] An agreement by Natural not to seek a greater return and by the customers and staff not to press for a zero return has every element of a meaningful bargain. That agreement was not articulated in express terms, but it is, we think, the meaning and consequence of the Settlement Agreement executed by the parties and duly approved by the Commission.
 
 
 42
 IV Validity of the Commission's Decision To Apply the Flow Through Policy to Natural's Rates as of the Date of Its Alabama-Tennessee Decision.
 
 
 43
 The Commission concluded that the flow-through policy should be applied to Natural's rates as of February 3, 1964, the date from which the Commission decided in Alabama-Tennessee that tax benefits from liberalized depreciation should be flowed through. We hold the Commission's action valid, and shall state our reasons while discussing and rejecting the attacks from both sides.
 
 
 44
 A. Contentions of Invalidity under the Natural Gas Act
 
 
 45
 Chicago contends that Section 4 (e) of the Natural Gas Act required the Commission to make its order retroactive to the effective date of the increased rates held invalid. Section 4(e) does give the Commission "power * * * to make its order retroactive, by means of the refund procedure, to the date the change became effective." United Gas Pipe Line Co. v. Mobile Gas Service Corp., 350 U.S. 332, 341, 76 S.Ct. 373, 379, 100 L.Ed. 373 (1956). That does not mean Section 4(e) requires this retroactive result. Explaining why its ruling was not made retroactive to the effective date of Natural's rate increase, the Commission stated "that in Alabama-Tennessee we were announcing a new policy and overruling previous decisions. It was therefore not equitable, contrary to the contentions of Chicago, to make our determination effective before February 3, 1964, but on that date the industry was informed of the new policy, and it was appropriate that refunds should be ordered from then."
 
 
 46
 Natural on the other hand contends that the Commission erred in applying its policies to Natural retroactively, that is prior to the date on which it found such policies valid as to Natural (March 18, 1965).
 
 
 47
 We reject both sets of contentions. The Commission acted sensibly and reasonably in making its new policy effective as of the date it was announced to the industry. We have recently upheld as reasonable, against a charge that retroactive application was unlawful, the Commission's determination under the Federal Power Act to make a license requirement effective as of the date it issued decisions setting forth new criteria for requirement of licenses. Niagara Mohawk Power Corp. v. FPC, 126 U.S. App.D.C. 376, 379 F.2d 153 (May 18, 1967).
 
 
 48
 Instructive analogy is afforded by precedents of both legislative and judicial branches. Customarily decisions of the judicial branch are retroactive and the legal principles announced by the court are considered to be the rules that governed transactions and events prior to the date of decision. But this is not a necessary feature even of the judicial process. In recent years the Supreme Court has deemed it appropriate to make several doctrines effective prospectively as of the date of its announcement of a change in the course of decision.[38] The Court has rejected the Blackstonian concept that decisions are only the exposition of pre-existing principles that are "discovered" by the "living oracle of the law," and that overruled decisions reflect only a human error in the Court failure of true discovery. Instead it took the view that even courts do more than discover the law, that overruled decisions are judicial facts and that practical consequences, such as hardship or injustice, can be taken into account in deciding whether changes in decision should be retroactive.
 
 
 49
 A similar destination is often reached from another direction by the legislative branch which customarily operates prospectively but frequently finds that the public interest lies in making legislation retroactive to the date of public awareness of consideration being given to proposed changes.[39]
 
 
 50
 The good sense and reasonableness, and hence presumptive validity, of a determination to start the effectiveness of a new policy with the date of a public awareness, are not to be gainsaid for an administrative agency because it states, as respondent Commission did, that this solution is "the most equitable resolution" it could reach.[40] It is argued to us that Section 4(e) "does not confer equity powers" upon respondent Commission. It may readily be agreed that a commission does not have the same range as an equity court to summon powers to the call of justice. It likewise does not have the power to punish for contempt. However, when an agency is exercising powers entrusted to it by Congress, it may have recourse to equitable conceptions in striving for the reasonableness that broadly identifies the ambit of sound discretion. Conceptions of equity are not a special province of the courts but may properly be invoked by administrative agencies seeking to achieve "the necessities of control in an increasingly complex society without sacrifice of fundamental principles of fairness and justice."[41]
 
 
 51
 Upholding the Commission's action is not equivalent, as Chicago suggests, to a ruling that the agency would be free to permit the utility to retain some rates the Commission had found unjust. The point is, rather, as respondent's brief puts it, that the "Commission's decision in effect means that until February 3, 1964, the date of the Alabama-Tennessee decision, rates reflecting normalization were just and reasonable," while rates reflecting normalization subsequent to the notice then given to the industry were "to that extent, excessive and unjustified."
 
 
 52
 Natural would have no cause for complaint over the 1964 date if in 1964 the Commission had proceeded by way of a policy regulation. On this record it shows no substantial ground for a difference in result because the agency declared a general principle in the context of an individual proceeding, but with leave to the industry to participate amicus curiae; it was free to utilize this technique notwithstanding the efforts of courts and scholars to encourage greater use of regulations for broad policy declaration.[42] Satisfied that its findings were valid with respect to Alabama-Tennessee "and other typical pipelines" the Commission left a gas pipeline not a party to that proceeding "legally free to introduce evidence and testimony of exceptional situations demonstrating the inapplicability of the determinations made in Opinion No. 417 to its individual situation."[43] That left a pipeline free to try to be excused, but did not require a postponement of the effective date for a company like Natural that did not even make an effort to claim its individual situation was "exceptional." New England Divisions Case, 261 U.S. 184, 199, 43 S.Ct. 270, 67 L.Ed. 605 (1923). A contrary requirement would breed litigation for the sole purpose of delay.
 
 
 53
 This leads us into a discussion of Natural's thorny contention that it is entitled to an October 1965 effective date because dates in this general range are reflected in the orders, with prospective effect, entered with regard to other companies. Certainly Natural is entitled to relief if it has been singled out for a difference in treatment not justified by a difference in conditions.[44] And Natural points out that Opinion 417, the Alabama-Tennessee opinion, after phrasing the issues, stated that the issue had been reserved in other cases, wherein "we uniformly provided that any changed policy * * * would have only a prospective effect on the rates and charges of the individual pipelines concerned." In a footnote Natural's case was listed along with three other cases where the ultimate result was prospective from a 1965 effective date.[45]
 
 
 54
 We find somewhat disingenuous the Commission's observation that the reference to the present proceeding in Opinion 417 conveys no more than that the same issue was presented in both cases. But we do agree that the description of the present proceeding, in the course of an introductory background, was not a commitment to make the present order effective as of the date of its issuance. The settlement obviously contemplated some refund if the liberalized depreciation issue was decided on the merits contrary to Natural's position. We think the Commission decided in accordance with the spirit of both the settlement and the forecast that a change in policy would be "prospective" by its decision under review making the change prospective from an effective date of February 3, 1964.
 
 
 55
 When we turn to the question of discrimination in factual results, we find that the proceedings listed by Natural involved sufficient differences in posture to negative the charge of arbitrary discrimination. All of the cases involved either a section 5(a) proceeding, in which the Commission has no statutory authority to order refunds and can act only prospectively,[46] or they involved section 4(e) proceedings in which rate reductions were put forward that included but were not limited to the reductions implementing flow throughs.[47]
 
 
 56
 The proposals were settlements consented to by consumers, cities, and state commissions. Agreed reductions and settlements may involve compromises that recognize that immediate reductions may be preferable to larger refunds sometime in the future.[48] Refunds are not an adequate substitute for an immediate rate reduction. FPC v. Tennessee Gas Transmission Co., 371 U.S. 145, 154-155, 83 S.Ct. 211, 9 L.Ed.2d 199 (1962). As to the Commission's order approving the joint rate reduction offer of American-Louisiana and Michigan-Wisconsin, affiliated companies which were cited along with Natural in the footnote in Opinion 417, the Commission's opinion under review noted that in those cases, unlike Natural, no evidence had been introduced on treatment of liberalized depreciation and a further evidentiary hearing would have been required, which was not the case as to Natural where no compromise was required in order to avoid delay in implementation, and also that reductions were proposed as to the rates payable by the consumers (to Michigan-Wisconsin).
 
 
 57
 Though the various Commission's actions have been, so to speak, reconciled so as to avoid the taint of illegal discrimination, we acknowledge an uneasiness that may well have its roots in the fact that the Commission's general policies were implemented in individual proceedings. The Commission followed up Opinion 417 with an accounting regulation, and charges of discrimination could have been obviated at the start by use of policy regulations both for restatement of the principles of the policy decisions and crystallization of implementing sub-principles. The continued expressions of courts and commentators stressing the desirability of generalized approaches to generalized problems (supra note 40), does not betoken a desire to meddle with administrative details and techniques, but rather an uneasiness lest an excessively individuated approach may be a seed bed that is too favorable to the rank weed of discrimination.[49] Judicial development of principles on a case-by-case approach is not a parallel because the courts cannot ordinarily call upon the legislative techniques available with a little effort to agencies, to canvass the range of problems and cases pending and to formulate generalized approaches for their disposition. Yet there are competing considerations that the courts cannot fully assess and in the last analysis the courts cannot invalidate the individuated techniques and results if they have not been shown to be arbitrary or discriminatory. Our conclusion here is that the showing requisite for nullification has not been made.
 
 
 58
 B. Contentions Based on Settlement Agreement
 
 
 59
 Chicago and Wisconsin present an alternative contention that the Settlement Agreement mandates application of the flow-through decision, either way, and refunds if any, as of March 1, 1961, the date Natural's increased rates became effective. We agree with the dissenting commissioner who found this contention persuasive on the general point that Natural may properly be held to its bargain even if it turned out badly. It was the prospect of holding Natural to this supposed bargain that apparently led the Joint Petitioners to agree with Natural that the Settlement Agreement did not reserve the issue of rate base reduction. But we do not read the Settlement Agreement as they do. Unlike the issue of rate base reduction previously discussed, the Settlement Agreement clearly does call on the Commission to issue a decision on the issue of Federal tax expense allowances. The parties said in effect: On this issue we cannot work out a settlement, and we leave it to the Commission to decide. The parties may well have assumed that any flow-through decision would be retroactive to 1961, they may have wholly failed to anticipate the possibility that the decision would be prospective, but they did not purport to fetter the Commission's discretion to make its decision prospective. In reaching its decision on the issues referred to it, the Commission was free to announce and apply the principles it deemed proper under the Natural Gas Act just as if it were disposing of a proceeding in which there had been no settlement. We have already upheld, as in accordance with its discretion under the Natural Gas Act, the Commission's decision, not only to provide for a "flow through" policy, but also to prescribe a 1964 effective date therefor. We do not think the Settlement prohibited application of that approach to Natural.
 
 
 60
 Although in general we have upheld the Commission's findings and action, our ruling in one aspect requires that its order be vacated and the case remanded for further proceedings.
 
 
 61
 So ordered.
 
 
 
 Notes:
 
 
 [1]
 26 U.S.C. § 167 (1964)
 
 
 [2]
 For present purposes "Natural" also includes Peoples Gulf Coast Natural Gas Pipeline Co., which filed separate rate increases but was thereafter combined with Natural
 
 
 [3]
 15 U.S.C. § 717c(e) (1964)
 
 
 [4]
 Opinion No. 367, 28 F.P.C. 731
 
 
 [5]
 31 F.P.C. 208
 
 
 [6]
 33 F.P.C. 574. The petitions for rehearing were denied in Opinion 456-A, June 23, 1965, 33 F.P.C. 1277
 
 
 [7]
 15 U.S.C. § 717r(b) (1964)
 
 
 [8]
 See FPC v. Hope Natural Gas Co., 320 U.S. 591, 64 S.Ct. 281, 88 L.Ed. 333 (1944); J. BONBRIGHT, PRINCIPLES OF PUBLIC UTILITY RATES 147-283 (1961); Francis, Rate Regulation of Natural Gas Companies by the Federal Power Commission, 19 LAW & CONTEMP.PROB. 413, 417-33 (1954).
 
 
 [9]
 City of Detroit, Mich. v. FPC, 97 U.S. App.D.C. 260, 263, 230 F.2d 810, 813 (1955)See Leventhal, Vitality of the Comparable Earnings Standard for Regulation of Utilities in a Growth Economy, 74 YALE L.J. 989 (1965).
 
 
 [10]
 United Fuel Gas Co., 12 F.P.C. 251, 265 (1953)
 
 
 [11]
 See generally Leventhal, supra note 9.
 
 
 [12]
 See Francis, supra note 8, at 425-30.
 
 
 [13]
 NATIONAL ASSOCIATION OF RAILROAD AND UTILITIES COMMISSIONERS [NARUC], PROCEEDINGS, 67th ANNUAL CONVENTION, 1955, 439-40 (1956); Eisner,Depreciation Under the New Tax Law, 33 HARV.BUS.REV. No. 1, 66-74 (1955); Davidson, Accelerated Depreciation and the Allocation of Income Taxes, 33 ACCOUNTING REV. 173 (1958).
 
 
 [14]
 1955 NARUC Proceedings,supra note 13.
 
 
 [15]
 See Alabama-Tennessee Natural Gas Co. v. FPC, supra, 359 F.2d at 336.
 
 
 [16]
 See North Central Airlines, Inc. v. CAB, 124 U.S.App.D.C. 251, 363 F.2d 983 (1966).
 
 
 [17]
 Judge Learned Hand in United States v. Klinger, 199 F.2d 645, 648 (2d Cir. 1952): "Flinch as we may, what we do, and must do, is to project ourselves, as best we can, into the position of those who uttered the words, and to impute to them how they would have dealt with the concrete occasion."
 
 
 [18]
 People of State of California v. FPC, 369 U.S. 482, 82 S.Ct. 901, 8 L.Ed.2d 54 (1962); City of Pittsburgh v. FPC, 99 U.S.App.D.C. 113, 126, 237 F.2d 741, 754 (1956)
 
 
 [19]
 American Overseas Airlines v. CAB, 103 U.S.App.D.C. 41, 254 F.2d 744 (1958)
 
 
 [20]
 The Commission found: "Natural is an expanding enterprise, and will continue to expand in the foreseeable future. Natural apparently does not dispute the fact that it is properly subject to the principles enunciated inAlabama-Tennessee if that case is upheld."
 While the Commission's earlier findings that Alabama-Tennessee was favorably situated in regard to raising of capital were not specifically repeated for Natural, the fact is not contested by Natural. Cf. FPC v. Natural Gas Pipeline Co., 315 U.S. 575, 597, 62 S.Ct. 736, 86 L.Ed. 1037 (1942).
 
 
 [21]
 Compare NATIONAL ASSOCIATION OF RAILROAD AND UTILITY COMMISSIONERS, PROCEEDINGS, 53d ANNUAL CONVENTION, 1941 369 (1942):
 The purpose of regulatory procedure, in the protection which it is designed to afford the consumer, is to simulate and substitute the effects of competition and give the consumer the benefits which he would derive from a system of competition.
 For statements in judicial decisions that "regulation takes the place of and stands for competition," see, e. g., State ex rel. on inf. Barker, Kansas City v. Kansas City Gas Co., 254 Mo. 515, 534, 163 S.W. 854, 858 (1913); State Pub. Util. Comm'n ex rel. City of Springfield v. Springfield Gas & Elec. Co., 291 Ill. 209, 218, 125 N.E. 891, 896 (1919).
 
 
 [22]
 97 U.S.App.D.C. 260, 230 F.2d 810, cert. denied, 352 U.S. 829, 77 S.Ct. 34, 1 L.Ed.2d 48, rehearing denied, 352 U.S. 919, 77 S.Ct. 211, 1 L.Ed.2d 125 (1956)
 
 
 [23]
 Amere Gas Util. Co., 15 F.P.C. 760, 781, petition for review dismissed, 16 F.P.C. 880 (1956). City of Lexington v. FPC, No. 13590 (June 26, 1957) (unreported)
 
 
 [24]
 115 U.S.App.D.C. 8, 316 F.2d 659, cert. denied, 375 U.S. 881, 84 S.Ct. 147, 11 L.Ed.2d 111 (1963)
 
 
 [25]
 The dissenting opinion was based on the premise that liberalized depreciation works a deferral of taxes, and that the Commission's switch in position between Phillips Petroleum Co., 24 F.P.C. 537, and Northern Natural Gas Co., 25 F.P.C. 431, was in "defiance" of ourCity of Detroit opinion. The majority opinion stated that nothing in the language or legislative history of Section 167 "indicates that Congress considered its regulatory consequences," characterized as merely "arguable" the possibility that regulatory decisions would be governed by the tax purpose of Congress, and held that even so that purpose was not thwarted by an action that retained some incentive to investment, and found the Commission had not abused its discretion.
 
 
 [26]
 New Castle County Airport Comm'n v. CAB, 125 U.S.App.D.C. 268, 371 F.2d 733 (1966),cert. denied, Board of Transportation of New Castle County, Delaware v. CAB, 387 U.S. 930, 87 S.Ct. 2052, 18 L.Ed.2d 991 (1967); Philadelphia Television Broadcasting Co. v. FCC, 123 U.S.App.D.C. 298, 359 F.2d 282 (1966). As Judge Prettyman said in Pinellas Broadcasting Co. v. FCC, 97 U.S.App. D.C. 236, 238, 230 F.2d 204, 206, cert. denied, 350 U.S. 1007, 76 S.Ct. 650, 100 L.Ed. 869 (1956): "[T]he Commission's view of what is best in the public interest may change from time to time. Commissions themselves change, underlying philosophies differ, and experience often dictates changes." [Emphasis added.]
 
 
 [27]
 See e. g., NLRB v. International Bhd. of Teamsters, etc., 225 F.2d 343, 348 (8th Cir. 1955).
 
 
 [28]
 Braniff Airways, Inc. v. CAB, 126 U. S.App.D.C. 399, 379 F.2d 453 (April 12, 1967);see also NLRB v. International Bhd. of Teamsters, supra note 27.
 
 
 [29]
 WKAT, Inc. v. FCC, 111 U.S.App.D.C. 253, 260-261, 296 F.2d 375, 382-383, cert. deniedsub nom. Public Service Television, Inc. v. FCC, 368 U.S. 841, 82 S.Ct. 63, 7 L.Ed.2d 40 (1961).
 
 
 [30]
 Massachusetts Trustees of E. Gas & Fuel Associates v. United States, 377 U. S. 235, 241, 84 S.Ct. 1236, 12 L.Ed.2d 268 (1964); Power Reactor Dev. Co. v. International Union of Elec., etc., Workers, 367 U.S. 396, 409, 81 S.Ct. 1529, 6 L. Ed.2d 924 (1961) (but cautions it "may often be shaky business to attribute significance to the inaction of Congress"); United States v. Shreveport Grain & Elevator Co., 287 U.S. 77, 84, 53 S.Ct. 42, 77 L.Ed. 175 (1932)
 The foregoing doctrine on inference of legislative acquiescence is over and beyond the general doctrine of deference to an administrative interpretation, see Udall v. Tallman, 380 U.S. 1, 16, 85 S.Ct. 792, 13 L.Ed.2d 616 (1965).
 
 
 [31]
 United States v. Morton Salt Co., 338 U.S. 632, 647-648, 70 S.Ct. 357, 94 L. Ed. 401 (1950) (powers "are not lost by being allowed to lie dormant");cf. Buckeye Cablevision, Inc. v. FCC, 128 U.S. App.D.C. ___, 387 F.2d 220 (June 30, 1967).
 
 
 [32]
 31 F.P.C. at 220. The Commission instituted a rule-making procedure to conform accounting regulations for recording tax balances to this determination
 The funds in Account 282 had previously been restricted against distribution in dividends, the Commission having specifically found they should be added to supply part of the capital requirements. Northern Natural Gas Co., 25 F.P.C. 431, 438, 441 (1961). They were thus different in kind from general revenues received without restriction as to disposition, cf. El Paso Natural Gas Co. v. FPC, 281 F.2d 567, 573-574 (5th Cir. 1960).
 
 
 [33]
 The previous policy of 1.5% rate of return on these balances was the determination affirmed by this court in Panhandle E. Pipe Line Co. v. FPC,supra note 22.
 
 
 [34]
 Section IV(2) of the Settlement Agreement provides:
 "2. The question of whether Natural, in computing its cost of service for rate purposes, should compute its federal income tax expense allowance by `normalizing' such taxes to eliminate the effect of Section 167 of the Federal Internal Revenue Code, which relates to `accelerated' or `liberalized' depreciation, or by utilizing the principle of `flow through' of the tax effect of the use of such `accelerated depreciation' deductions for tax purposes, as proposed and defined by the City of Chicago in these proceedings, rather than the `normalization' method, shall be determined by and adjudication by the Commission in these proceedings and this issue shall not be terminated by approval of the settlement proposed hereunder.
 * * * * *
 "In the event it shall be determined in these proceedings by a valid and final order of the Commission that Natural, in computing its cost of service in these proceedings, must utilize the above mentioned `flow through' method of tax computation, Natural, subject to its right to seek judicial review thereof, shall make such further refunds, with interest at 7 per cent per annum from the 20th day of each month in which each excess payment was collected, to the date Natural refunds such excess payment, as shall result from the reduction, if any, in the level of any of the rates contained in its FPC Rate Schedules that may be required by the Commission at the time of such order; provided, however, that Natural's obligation to make a refund hereunder shall not become effective unless and until the aggregate sum refundable under this Paragraph (2) shall be equal to $100,000.
 "It is agreed that the difference between the depreciation deduction used in computing the Federal Income Tax allowance by use of the above mentioned `normalization' method, which is included in the cost of service of $137,014,823, and the depreciation deduction for such tax allowance purposes, relative to such cost of service, which would have resulted from use of the above mentioned `flow through method' is $7,928,320. Any refunds and/or rate deductions made by reason of this Section IV(2) shall be made as described in the last paragraph of Section IV(1) above."
 
 
 [35]
 The Commission brief concedes that "the return allowance itself, as opposed to the consequent tax allowance, is not within the literal language of the settlement."
 No element of "return" is inserted by the provision of the settlement that the Commission shall decide whether to compute federal income tax expense allowance by utilizing the "flow through" principle of the tax effect "as proposed and defined by the City of Chicago in these proceedings, rather than the `normalization' method."
 Mr. Van Scoyoc's prepared testimony and exhibits, with computations of tax impact, nowhere refer to the "return" problem. After he noted that the Company's cost of service exhibit ignored the $8,124,909 shown in the Staff exhibit as tax deductions due to liberalized depreciation, Mr. Van Scoyoc was asked: "Q. If the principle of actual taxes were used in the Company's cost of service as you advocate what would be the effect on the ratepayer of utilizing this $8,124,909 in available tax deductions in computing income taxes for cost of service purposes?
 "A. It would result in lowering the cost of service by 108 1/3 percent of $8,124,909 or $8,801,982, assuming the use of a 52 percent tax rate."
 Mr. Van Scoyoc's response shows the effect of a different tax allowance without any adjustment of the return component. His statement on cross-examination cited in the Commission's brief states what he thinks return should be (zero), but does not state that this is the same as the issue of the determination of the tax expense allowance.
 
 
 [36]
 City of Alton v. Commerce Comm'n, 19 Ill.2d 76, 165 N.E.2d 513 (1960)
 
 
 [37]
 See Panhandle E. Pipe Line Co. v. FPC, supra note 22.
 
 
 [38]
 Stovall v. Denno, 388 U.S. 293, 87 S. Ct. 1967, 18 L.Ed.2d 1270 (1967); Johnson v. State of New Jersey, 384 U.S. 719, 86 S.Ct. 1772, 16 L.Ed.2d 882 (1966); Tehan v. United States ex rel. Shott, 382 U.S. 406, 86 S.Ct. 459, 15 L.Ed.2d 453 (1966); Linkletter v. Walker, 381 U.S. 618, 85 S.Ct. 1731, 14 L.Ed.2d 601 (1965). The foregoing involve constitutional questions. However, in James v. United States, 366 U.S. 213, 81 S.Ct. 1052, 6 L.Ed.2d 246 (1961), the Court overruled an earlier decision on a question of statutory construction (that embezzled funds are not taxable income), but declined to apply the new decision retroactively so far as criminal prosecutions are concerned. That a state court may validly limit to prospective application its reversal of view as to the meaning and application of a statute was stated in Great Northern Ry. Co. v. Sunburst Oil & Ref. Co., 287 U.S. 358, 53 S.Ct. 145, 77 L.Ed. 360 (1932)
 
 
 [39]
 Welch v. Henry, 305 U.S. 134, 59 S. Ct. 121, 83 L.Ed. 87 (1938); United States v. Hudson, 299 U.S. 498, 57 S.Ct. 309, 81 L.Ed. 370 (1937); Sidney v. Commissioner of Internal Revenue, 273 F.2d 928, 932 (2d Cir. 1960)
 
 
 [40]
 "We do agree with Chicago, however, that it should not have to bear the loss resulting from the time that has elapsed since our decision a year ago inAlabama-Tennessee. We think the most equitable resolution of this matter is to put Natural on a par with Alabama-Tennessee."
 
 
 [41]
 Niagara Mohawk Power Corp. v. FPC,supra, 379 F.2d p. 160.
 
 
 [42]
 SEC v. Chenery Corp., 332 U.S. 194, 202-203, 67 S.Ct. 1575, 1760, 91 L.Ed. 1995 (1947); Alabama-Tennessee Natural Gas Co. v. FPC, 359 F.2d at 343; International Union of Operating Eng'rs v. NLRB, 122 U.S.App.D.C. 314, 318, 353 F.2d 852, 856 (1965)
 
 
 [43]
 Opinion 417A, Alabama-Tennessee Natural Gas Co., 31 F.P.C. 928, 930 (1964) (on rehearing)
 
 
 [44]
 McKay v. Wahlenmaier, 96 U.S.App.D. C. 313, 226 F.2d 35 (1955)
 
 
 [45]
 Opinion 417,supra, 31 F.P.C. at 209.
 
 
 [46]
 Midwestern Gas Transmission Co., 32 F.P.C. 993 (1964). In this opinion (No. 444), the Commission ordered a further hearing to determine whether or not use of liberalized depreciation would be proper in computing the tax element of prospective cost of service, at which hearing Midwest would have opportunity to show why, starting in 1963, it used straight line depreciation in its tax return. The deferral of the ruling on Midwestern is not inconsistent with requiring use of lower actual tax payments for a utility, like Natural, that used liberalized depreciation on its tax returns. It rather presents a different issue, whether and under what circumstances the Commission may or should utilize a tax component lower than Federal taxes actually paid
 
 
 [47]
 E. g., Panhandle E. Pipe Line Co., 31 F.P.C. 736 (1964); Trunkline Gas Co., 31 F.P.C. 743 (1964). See also note 46
 
 
 [48]
 American Louisiana Pipe Line Co., 31 F.P.C. 1579 (June 23, 1964). The reduction on other matters by Michigan-Wisconsin could be taken into account in considering whether the public interest warranted acceptance of a joint proposal by that company and its affiliated supplier
 
 
 [49]
 Compare H. FRIENDLY, THE FEDERAL ADMINISTRATIVE AGENCIES: THE NEED FOR BETTER DEFINITION OF STANDARDS (1962) passim. Judge Friendly concludes that the case-by-case technique of the CAB muddied the waters so as to retard rather than advance the development of an overall policy approach to the problem of route structure (p. 105)