511 F.2d 338
 167 U.S.App.D.C. 100
 PUBLIC SERVICE COMMISSION FOR the STATE OF NEW YORK, Petitioner,
v.
FEDERAL POWER COMMISSION, Respondent.
PUBLIC SERVICE COMMISSION OF the STATE OF NEW YORK, Petitioner,
v.
FEDERAL POWER COMMISSION, Respondent.
 Nos. 73--1338, 74--1301.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued April 16, 1974.
Decided Jan. 14, 1975.
 
 Richard A. Solomon, Washington, D.C., with whom Peter H. Schiff, Gen. Counsel, Public Service Commission of the State of New York, Albany, N.Y., was on the brief, for petitioner.
 Charles E. Bullock, Atty., F.P.C., with whom Leo E. Forquer, Gen. Counsel, and George W. McHenry, Sol., F.P.C., were on the brief for respondent. Platt W. Davis, III, Atty., F.P.C., also entered an appearance for respondent.
 Before BAZELON, Chief Judge, and LEVENTHAL and ROBB, Circuit Judges.
 LEVENTHAL, Circuit Judge:
 
 
 1
 In October 1970, the Federal Power Commission authorized natural gas pipelines to include in their rate bases certain advance payments made to natural gas producers for gas to be delivered at a future date.[1] The FPC's action was one of a number of efforts to spur capital formation for gas development in order to alleviate the critical shortage of natural gas.[2] The Public Service Commission of the State of New York (New York) sought review in this court of the FPC order establishing rate base treatment of advance payments.[3] Prior to the resolution of that appeal, the FPC modified its initial order, restricting its scope and limiting its duration to the period ending December 31, 1972.[4]
 
 
 2
 This court sustained the advance payment scheme on the basis of 'the temporary character of the FPC order' and 'our belief that it represented a justifiable experiment in the continuing search for solutions to our nation's critical shortage of natural gas.' Public Service Commission v. FPC, 151 U.S.App.D.C. 307, 317, 467 F.2d 361, 371 (1972). We stressed the need for further evaluation by the FPC prior to any continuation of rate base treatment of advance payments to producers.
 
 
 3
 Fundamental to the concept of any experiment is the assumption that the data developed from the experience thereunder will be subjected to meaningful review, analysis, and evaluation before the experimental practice is allowed to continue or to become institutionalized as a more permanent procedure.
 
 
 4
 In approving this temporary order, we had no intention of abridging that concept nor of approving capitalization of advance payments beyond its stated expiration date without the FPC having first carefully evaluated the experience under Order 441 to determine whether its justifying objectives are being satisfactorily met at an acceptable level of ultimate economic cost to the nation's gas consumers.[5]
 
 
 5
 Since our 1972 opinion, the FPC has twice reaffirmed the rate base treatment accorded advance payments to producers and has expanded the types of payments eligible for such treatment.[6] Data compiled by the Commission reveal that as of July 30, 1973, pipelines had committed advance payments totalling over one and a quarter billion dollars to producers in the 'lower 48' states and had actually advanced them over a billion dollars.[7] The ultimate cost to the consumer attributable to the funds already advanced has been estimated to exceed half a billion dollars.[8]
 
 
 6
 Although the FPC's continuation of the program has been through orders for successive extensions of one year and two year periods and the FPC has directed its staff to continue its evaluation of the program during the present term, the rate base treatment of advance payments can no longer be viewed as a temporary, experimental approach to the supply problem. The Commission's endorsement of rate base treatment in five orders and the huge sums involved in escalating advance payments commitments[9] indicate that the initial experimental practice has 'become institutionalized as a more permanent procedure.'[10] The present case requires us to examine whether the FPC's actions have been premised on the type of meaningful review, analysis, and careful evaluation of experience called for by our earlier opinion.
 
 
 7
 New York urges that the Commission has not developed 'a proper factual predicate' to support the continuation of the advance payments program.[11] New York does not call for the abolition of all rate base treatment of advance payments.[12] Rather it contends that the present size and scope of the program cannot be sustained as a reasoned exercise of the Commission's discretion based on the record as a whole.
 
 
 8
 After a thorough review of the record before us, we find that the FPC has failed to engage in 'meaningful review, analysis, and evaluation' of the experience under the advance payments program. The data presented by the Commission as a justification of its repeated extensions of the advance payments program provide an inadequate basis from which 'to determine whether its justifying objectives are being satisfactorily met at an acceptable level of ultimate economic cost to the nation's gas consumers.'[13] Accordingly, we remand the record for further evidence and consideration by the FPC.[14]
 
 I. THE ADVANCE PAYMENTS ORDERS
 
 9
 We begin with a brief review of the origin of the advance payments program and changes in its scope since its inception.
 
 
 10
 The first of the five advance payment orders was Order 410, issued October 2, 1970, which established new Account 166, Advance Payments for Gas, and provided that 'advance payments for gas would be recorded as prepayments and unrecovered advance payments would be included in the rate base as part of working capital.'[15] The order defined advance payments to include amounts paid to independent or affiliated producers for exploration, lease acquisition, development, or production of natural gas, 'when such advance payments are to be repaid by delivery of gas.[16] Other provisions indicated that advances should be repaid within a five year period and that the rate base account must be credited by the amount of advances which become non-recoverable.[17] The rationale underlying this procedure was that rate base treatment would allow the pipeline to pass on to the consumer the monetary cost of making advances--i.e., the rate of return on this part of the rate base, and thus would induce advance payments which would supply producers with capital required for the development of additional gas supplies.[18]
 
 
 11
 The Commission was persuaded on rehearing to renotice Account 166 in order to afford further opportunity for comment. The renotice was set forth in a Notice of Proposed Rulemaking in Docket No. R--411, issued on January 8, 1971.[19] The same day, the FPC issued Order 410--A, which provided interim rate base treatment for 'advances by pipelines to independent producers for exploration and lease acquisition costs.'[20] That order reserved the question of the appropriate treatment of exploration and lease acquisition advances made by pipelines to their own affiliates for consideration in the upcoming docket.[21]
 
 
 12
 The reconsideration led to Order 441, November 10, 1971, which adopted certain modifications and limited the advance payments program to the period ending December 31, 1972.[22] It created Account 167, Other Advance Payments for Gas, a mechanism to record all advances not accorded rate base treatment. The FPC determined that rate base treatment would be denied to all advances for exploration and lease acquisition, as well as payments to both affiliated and independent producers which resulted in a working interest.[23] Order 441 also provided that where economic interests other than a working interest were received by a pipeline as a result of an advance payment properly includable in the rate base, 'any realization therefrom' was to be treated 'so as to reduce the (pipeline's) cost of service.'[24] Further, the FPC confined its rate base treatment program to advances which required repayment in full 'by either delivery of natural gas or other consideration' and added the requirement that, unless otherwise authorized, repayment must take place within five years after the date of advance.[25]
 
 
 13
 In the March 1972 ruling that affirmed the FPC's initial orders allowing rate base treatment of advance payments, this court relied on Order 441 as evidencing the Commission's 'willingness to assimilate criticism from parties such as New York, and adjust its treatment of advance payments to conform with the realities of the natural gas market.'[26] Since our 1972 decision, however, the Commission has reversed course in Orders 465 and 499 and has significantly enlarged the types of advances includable in the pipeline's rate base.
 
 
 14
 On July 3, 1972, the FPC issued a Renotice of Proposed Rulemaking and Request for Comments in Docket No. R--411,[27] stating that the new proceeding would 'undertake a careful evaluation of the experience under Commission Order No. 441.'[28] The notice requested comment on the advisability of continuing rate base treatment beyond the December 31, 1972, expiration date, restoring advances for exploration and lease acquisition to Account 166, handling advances to pipeline affiliates like advances to independent producers, and requiring producers to pay 7% annual interest on advance payments.[29] Comments were filed by 49 respondents, including 21 independent producers, 13 pipelines, and 8 affiliated companies.[30] The Commission also collected data from all pipelines that had filed advance payment agreements under the prior orders and sought comments from interested parties on the summary tabulations.[31]
 
 
 15
 Order 465, December 29, 1972, extended the advance payments program for one year and made several major modifications. First, the Commission reallowed rate base treatment for advances in aid of exploration but continued to deny it for lease acquisition advances.[32] Second, rate base treatment was extended to advances by a pipeline to an affiliate even though the affiliate obtained a working or other economic interest.[33] Third, the five year repayment in full requirement of Order 441, was replaced with a provision that all that need occur within the five year period was commencement of gas deliveries, or a determination that the repayment would be made in another form of consideration. This relaxation was accompanied by a provision mandating the immediate removal of an advance from Account 166 and a refund to the pipeline's customers within twelve months if an advance 'results in the finding of proven reserves of natural gas, gas deliveries commence, but no gas flows to the advancing pipeline.'[34] The Commission declined to call for a 7% interest payment on producers receiving advances. After New York's petition for rehearing of Order 465 was denied on February 27, 1973,[35] New York filed the present action for review.
 
 
 16
 Following another round of comments, the Commission issued Order 499 on December 28, 1973.[36] This order continued the program for two years and extended it to Alaskan advances made under future contracts.[37] Advances to independent producers resulting in the acquisition of a working interest were made eligible for rate base treatment, and the FPC refused to require that economic benefits derived from working interest advances be credited against the pipeline's cost of service.[38] The only limitation was the announcement of a general policy to deny rate base treatment for advances 'in excess of costs for exploration, development and production incurred by the producer within a reasonable time from the date such amounts advanced are included in the pipeline's rate base.'[39] In its order denying rehearing, the FPC rejected New York's request for standards for the implementation of this policy and announced that it would 'examine each advance on a case by case basis.'[40] The Commission has directed its staff to conduct an ongoing evaluation of the program's effectiveness in alleviating the gas shortage.[41] New York's petition for rehearing of Order 499 was denied on February 22, 1974, and its petition for review of the order was filed on March 1, 1974.[42]
 
 II. STANDARDS OF JUDICIAL REVIEW
 
 17
 Section 19(b) of the Natural Gas Act provides that in review of Commission orders by the courts of appeals '(t)he finding of the Commission as to the facts, if supported by substantial evidence, shall be conclusive.'[43] The Supreme Court has stressed that a presumption of validity attaches to the informed judgment of the Commission and that 'those who would overturn the Commission's judgment undertake 'the heavy burden of making a convincing showing that it is invalid because it is unjust and unreasonable in its consequences."[44]
 
 
 18
 In the Permian Basin Area Rate Cases, the Supreme Court delineated the responsibilities of reviewing courts charged with the duty of applying the substantial evidence standard.
 
 
 19
 (The) responsibilities of a reviewing court are essentially three. First, it must determine whether the Commission's order, viewed in light of the relevant facts and of the Commission's broad regulatory duties, abused or exceeded its authority. Second, the court must examine the manner in which the Commission has employed the methods of regulation which it has itself selected, and must decide whether each of the order's essential elements is supported by substantial evidence. Third, the court must determine whether the order may reasonably be expected to maintain financial integrity, attract necessary capital, and fairly compensate investors for the risks they have assumed, and yet provide appropriate protection to the relevant public interests, both existing and foreseeable.[45]
 
 
 20
 These three duties are in effect summarized in Justice Harlan's next sentence, which crystallizes the court's function: 'The court's responsibility is not to supplant the Commission's balance of these interests with one more nearly to its liking, but instead to assure itself that the Commission has given reasoned consideration to each of the pertinent factors.'[46]
 
 
 21
 In its recent decision in Mobil Oil Corp. v. FPC,[47] the Supreme Court identified that the courts of appeals--rather than the Supreme Court with its 'narrow and circumscribed' authority--had been assigned the major responsibility for assuring that the agency has given reasoned consideration to the material factors, and determining whether there was substantial evidence to support each of the essential elements of the agency's actions.[48]
 
 
 22
 In reviewing orders of the Federal Power Commission the courts are attentive to the requirement of 'reasoned consideration'--the ultimate issue in judicial review of its determinations. In 1972, we said in City of Chicago v. FPC, that in applying the 'substantial evidence test . . . reasoned conclusions are the hallmark of regularity.'[49] In 1973, we ruled, in Public Service Commission v. FPC (Texas Gulf Coast Area Rate Cases), that Commission efforts to obtain needed gas supplies 'must be accompanied by reasoned consideration and coming to grips with issues.'[50] In 1974, in Macdonald v. FPC, we held that the evidentiary record developed by the Commission must demonstrate that 'it 'has given reasoned consideration' and 'appropriate protection' to the public interest in not paying prices for gas substantially in excess of those needed to induce production of an adequate gas supply.'[51]
 
 
 23
 The Supreme Court's recent decision in Mobil Oil does not alter the standard of judicial review set forth in its earlier opinions, although it provides a gloss for applying that standard to Commission efforts to remedy the nation's pressing gas supply problems. In Mobil Oil, the Court affirmed the Fifth Circuit's decision upholding the Southern Louisiana Area rate orders which included contingent escalation and refund credit provisions designed to induce gas producers to expand exploration and production.[52] The Mobil Oil opinion relied extensively on the Permian Basin decision and expressly endorsed the 'criteria governing the scope of judicial review' set forth in Justice Harlan's opinion in that case.[53] Mobil Oil stated that the court of appeals had not 'misapprehended or grossly misapplied the substantial evidence standard' in adjusting that test 'in this time of acute energy shortage' to provide greater freedom for novel Commission proposals.[54]
 
 
 24
 For present purposes, the most pertinent aspect of Mobil Oil is its discussion of the Fifth Circuit's conclusion that the refund credits and contingent escalations constituted appropriate means to assist capital formulation.[55] The Court found that an inability to 'determine the precise amount of additional gas supply that would be found and dedicated to interstate sales' as a result of the incentive formula was not fatal where '(t)he Commission took massive evidence on supply, demand, and the relation between the two' and where '(i)ts difficulties . . . did not stem from any failure to seek answers.'[56] Courts 'cannot fairly demand the perfect at the expense of the achievable' and ought not insist on findings which are 'unrealistically and unnecessarily refined.'[57] However, problems which preclude precise quantification do not excuse the Commission's abdication of its duty to indicate 'fully and carefully the methods by which, and the purposes for which, it has chosen to act, as well as the consequences of its orders for the character and future development of the industry.'[58]
 
 
 25
 We turn to an analysis of the extent to which the FPC has discharged this duty.
 
 
 26
 III. CHALLENGES TO THE ADVANCE PAYMENTS ORDERS
 
 
 27
 A. The Commission's Analysis of the Experience under the Initial Advance Payment Orders
 
 
 28
 I. Data Advanced by the Commission in Support of its Orders
 
 
 29
 In the various rulemaking notices issued after our 1972 decision, the FPC proposed to undertake an 'in-depth analysis of developments under the advance payment agreements.'[59] The sum of its undertaking in each of these proceedings consisted of the solicitation of comments of interested parties on the general performance and selected aspects of the advance payments procedure and the compilation of data from all pipeline companies that had filed advance payment agreements. The information obtained from the pipelines included: (1) the amount of advances committed to producers-; (2) the amount of funds actually advanced, divided into payments for lease acquisitions and exploration, development drilling, and proven reserves; (3) the quantity of proven and potential gas reserves associated with the advance; and (4) the dollar amount of advances recovered and estimated to be non-recoverable.[60]
 
 
 30
 In Order 465 the Commission relied primarily on the data provided by the participating pipelines to justify the extension of the program for one year beyond the initial December 31, 1972 expiration date. The Commission found that:
 
 
 31
 Attachment D schedules II(a) and (b) show that Proved Reserves obtained in the Lower 48 (states) amount to 8.7 trillion cubic feet (Tcf) from advances subject to Order Nos. 410 and 410--A and 0.8 Tcf from advances subject to Order No. 441 for a total of 9.5 Tcf. Assuming that the total of pre-441 advances in the lower 48 states ($481,849,239) are recovered on the average in 5 years, there is a one year lag between the advance and commencement of recoupment and an average cost to the consumer of 13% for return and taxes; we estimate that the added cost to the consumer for the 8.7 Tcf of proven reserves will be approximately 2.5cents per Mcf over the field price of gas purchased from those reserves.
 
 
 32
 Considering that the above reported data shows that advances to date have resulted in the addition of approximately nine and one half Tcf of proven gas reserves in the lower 48 states and in view of our analysis of all of the responses to the renotice and our review of the program of advances in general, we find that rate base treatment of advances to producers has 'represented a justifiable experiment in the continuing search for solutions to our nation's critical shortage of natural gas.' (quoting from Public Service Commission v. FPC, 151 U.S.App.D.C. 307, 317, 467 F.2d 361, 371 (1972)) Therefore, in view of the 'temporary nature . . . and . . . ongoing experimental character' (id. at 316, 467 F.2d at 370) of the advances program, it is reasonable and appropriate that the program be extended for the period ending December 31, 1973, and that all advances made pursuant to contractual agreements executed after the issuance of this order, but not later than December 31, 1973, be made subject to the provisions of this order.[61]
 
 
 33
 The initial problem with these findings is that the FPC appears to assume that all of the proven gas reserves associated with the advance payments constituted additional gas supply developed as a result of the advances. Nothing in Order 465 evinces a Commission inquiry into the incremental increase in gas supply attributable to the investment capital made available to producers by advance payments from pipelines. Several participants in the rulemaking docket brought this matter to the FPC's attention. New York argued that 'the Commission's basic fallacy' was 'its assumption that the reserves have been added to the interstate market because of the advance payments. For this assumption the Commission cites no supporting data or evidence whatsoever.'[62] In a similar vein, Mobil Oil reiterated comments submitted prior to the issuance of Order 465 which noted that 'the data are not useful for attributing any reserve additions only to the advance payments experiment.'[63] Mobil pointed out that the vast bulk of the advances were made in the Southern Louisiana Area where they would compose only a small part of the total expenditures for gas development. Both Mobil and New York questioned whether the data enabled the Commission to separate advances which contributed to discovery and development from those which served primarily as commitment fees paid by pipelines to obtain access to proven reserves.[64]
 
 
 34
 The FPC responded to these arguments by issuing an order of clarification, and denial of rehearing, of Order 465.[65] In essence, the Commission retreated to the position that the advanced payments had accelerated rather than generated the 9.5 Tcf of proven reserves discussed in its order. Without setting forth any further analysis or additional data, the FPC concluded that 'the advances program was a significant and necessary factor in speeding the capital formation which led to the exploration, development, and dedication of 9.5 trillion cubic feet of proven reserves from onshore as well as offshore for use by the interstate market at the time in which it occurred.'[66]
 
 
 35
 Despite continued objection by New York,[67] the Commission did not attempt to expand its inquiry in its next advance payments rulemaking proceeding in order to isolate the effects of the program on the amount of natural gas available to the interstate market. Rather, it relied on a mere updating of the data summary employed in Order 465. Lapsing back into terminology utilized in the original Order 465, the Commission found that since the prior order proven reserves 'resulting from the advance payment program' had increased .8 Tcf to 10.3 Tcf and potential reserves had expanded dramatically from 4.75 Tcf to 9.5 Tcf.[68] In addition, the Commission recalculated the added cost to consumers attributable to the program. On the assumption that cost of the program could be spread over all of the proven reserves which it associated with advance payments, the FPC estimated that through Order 441 the program cost the consumer 3.6cents per Mcf over the field price of gas.[69] On the basis of the total increase in proven and potential reserves and the added cost to consumers, the FPC in Order 499 extended the program for a two-year term expiring on December 31, 1975.[70]
 
 
 36
 We do not believe that the FPC's actions in Orders 465 and 499 amounted to the kind of evaluation of the experience under the program necessary to discharge the Commission's responsibility 'to determine whether its justifying objectives are being satisfactorily met at an acceptable level of ultimate economic cost to the nation's gas consumers.'[71] The data developed by the FPC in its rulemaking proceedings fell short of that needed to underpin such a determination.
 
 
 37
 Justification of the program depends on the attraction of new or additional quantities of gas supply to the interstate market, or at least on the advancement of the date at which some gas reserves become available to that interstate market. The record fails to disclose any effort by the FPC either to quantify the amount of gas attracted to the interstate market by advances, to focus on the quantity of gas reserves for which advance payments' capital had an 'accelerating effect,' or to gauge the average time saved as result of the program's speeding of capital formation. The 3.6cents per Mcf estimate contained in Order 499 reflects a bald assumption that all of the 9.756 Tcf of proven reserves resulted from advance payments.[72] A true estimate of the program's costs could only be obtained by making a fair and realistic estimate of the extent of the reserves, the portion of the 9.756 Tcf, whose availability was either secured or accelerated as a result of advance payments.[73] Yet there was a complete absence of either pertinent data or informed estimates of these incremental effects of the capital provided by advance payments.
 
 
 38
 In Mobil Oil the Supreme Court excused the Commission's inability to determine the precise supply effects of its contingent escalation and refund work-off credits where the FPC had taken 'massive evidence' on that issue and its shortcomings 'did not stem from any failure to seek answers.'[74] In such circumstances a reviewing court might well conclude that the Commission had given 'reasoned consideration' to the crucial questions raised by its proposed course of action. In the present case, however, there is a 'failure to seek answers.' The Commission has not called for testimony by informed witnesses concerning the marginal impact of the capital supplied by the advance payments program on the gas supply problem.[75] The Commission's simplistic assumption, attributing all of the added reserves to the advances program, resulted in a failure to focus on and give reasoned consideration to the ultimate issue presented--the balance between the costs and benefits of the advance payments program, and the assessment in the light of that balance of whether the program serves the public interest.
 
 
 39
 2. Failure to Examine the Effect of Other Methods of
 
 Enhancing Capital Formation
 
 40
 The rationale underlying the Commission's rate base treatment of advance payments is that payments are necessary to supply capital for gas production and to induce producers to dedicate gas to the interstate market. Since the commencement of the advance payments program, the Commission has taken a number of actions to improve the capital position of gas producers. First, beginning in 1970, the FPC set new area rates which provide higher prices for both new and flowing gas from various major production regions.[76] An area rate scheme including increases in ceiling prices as well as contingent escalation-and workoff credit provision intended to 'help in generating capital funds' was recently upheld by the Supreme Court in Mobil Oil.[77] Second, in addition to these area rate increases, the Commission has engaged in national programs to raise prices for the purpose of enhancing supply: its 1972 optional certification procedure and its 1974 national base rates.[78] Third,
 
 
 41
 New York points to the emergence of massive 'drilling funds' assembled by producers from the general public as another post-1970 development which calls into question the importance of providing capital through advance payments.[79]
 
 
 42
 In Order 441, the FPC explicitly referred to its Southern Louisiana and Texas Gulf Coast opinions and noted that the just and reasonable rates established therein reflected 'the required level of capital formation' needed to elicit 'requisite gas supply.'[80] The Commission went on to conclude that the existing difficulty in capital formation 'supports our continuation for the limited period (until December 31, 1972) of the rate treatment of advance payments.'[81] Despite this recognition that changes in rate structures would affect the need to extend the experimental advance payments program, neither of the two subsequent Commission orders continuing rate base treatment included a reassessment of the availability of adequate investment capital for gas development. In its opinion denying rehearing in Order 465, the FPC asserted that the extension of the program was 'a necessary complement to our other efforts to obtain additional supplies of natural gas for the interstate market.'[82] This assertion was not accompanied by any findings or references to evidence in the record.[83] Moreover, the FPC did not address New York's argument, presented in comments filed in the rulemaking which culminated in Order 499 and based on submissions in other FPC proceedings which indicated that there was no longer a shortage of capital--at least with regard to crucially significant offshore are-as, where reserves are massive in extent, and may be committed by the federal government to the interstate market.[84] Like the defect in its analysis of the data summary of the reports by pipelines, the Commission's failure to assess the impact of its other responses to the gas crisis identified above (see text at footnotes 77 and 78) precluded its recent orders from constituting a meaningful review and evaluation of the advisability of extending the advance payments program. Instead of 'coming to grips with issues' of central importance to the rule-making, the Commission seemed content to rely on interested parties' approval of the program.[85] The Commission could not faithfully discharge its responsibility to provide "appropriate protection' to the public interest in not paying prices for gas substantially in excess of those needed to induce production of an adequate gas supply' while ignoring the present capital position of the gas producers.[86]
 
 
 43
 3. Advance Payments for Offshore Exploration and Development
 
 
 44
 We turn to the Commission's treatment of advances made in connection with offshore production. Although New York repeatedly noted important factors that differentiate offshore from onshore advances, the Commission virtually ignored the problem. The denial of rehearing in Order 465 and the discussion in Order 499 responded to New York's argument by a bare reference to the total volume of proven reserves 'from onshore as well as offshore.'[87] The Commission's order denying rehearing in Order 499 indicates that it feels no separate problem is presented by offshore advances.
 
 
 45
 New York alleges that the Commission has again failed to distinguish between onshore and offshore advances. This argument has been considered in Order No. 499 as well as in the order denying rehearing of Order No. 465, issued February 23, 1973 (mimeo, pp. 3--4) and needs no further discussion herein.[88]
 
 
 46
 The Commission's treatment of advances related to offshore gas blandly sidesteps all and any mention of the critical fact of its plenary power to prevent diversion of gas from wells on leases in the federal domain to the interstate market.[89] Whatever role advance payments may play in attracting onshore gas from the intrastate and to the interstate market, this justification is absent in the case of advances to offshore producers. Any reasoned assessment of the relation of costs and benefits of the advance payments program involves manifestly different calculations for offshore and onshore advances. The complete failure on the part of the FPC to focus on this issue is a failure to seek answers.
 
 
 47
 Moreover, the Commission declined to respond to submissions by New York which cast doubt on the need for advances to spur acceleration of the exploration and development of offshore reserves. In the most recent proceeding New York cited the statement of a major pipeline executive that the need to recoup amounts expended on offshore leases generated strong pressures for prompt development of reserves.[90] This is in addition to New York's reference to an Exxon statement that there is no 'shortage of exploration and development capital for the offshore areas of the United States,'[91] The significance of the Commission's failure to come to grips with the separate problems posed by offshore advances is highlighted by the data that the great bulk of total advance payments has been concentrated in the Southern Louisiana Area, a region that includes substantial offshore gas production.[92]
 
 
 48
 B. Treatment of Advance Payments Which Result in Acquisition of a Working Interest
 
 
 49
 In successive orders, the Commission has reversed its position whether to give rate base treatment to advances which lead to the acquisition of a working interest by the pipeline. In November 1971, Order 441 denied rate base treatment to all such advances.[93] In December 1972, Order 465 allowed the inclusion in the pipeline's rate base account of advances resulting in a working interest in producers affiliated with the pipeline.[94] In December 1973, Order 499 authorized rate base treatment for advances yielding a working interest in either independent or affiliated producers.[95] New York consistently opposed rate base benefits where a working interest was obtained because that working interest 'compensates the pipeline for its expenditure, and there is no basis for contending that the cost of the pipeline's investment should be borne by its consumers.'[96]
 
 
 50
 New York alternatively requested that inclusion of advances in the rate base be accompanied by a corresponding credit reducing pipelines cost of service in the event a working interest procured with the advance generated a return, all to the end that the pipeline's stockholders would not benefit at the expense of consumers.[97] In Order 441 the Commission required a reduction in the pipeline's cost of service for any realization resulting from '(e)conomic interests other than working interests received as a result of making advance payments, where the related advance payments have been accorded rate base treatment.'[98] The FPC found that 'while it is equitable for the companies to earn on advance payments necessary to contracts for supplies, it would, however, be inequitable to deny any excess benefit from such advances to the companies' consumers through reduction of the cost of service.'[99] In denying a similar credit for the benefits of a working interest stemming from advances included in the pipeline's rate base, the FPC did not address the problem of inequity or attempt to explain how it distinguished working interests from other economic interests. All the Commission stated was this:
 
 
 51
 Most of the parties responding (to) the proposal to credit the benefits of a working interest to a pipeline's cost-of-service opposed the provision. We agree. In order to stimulate and encourage pipeline production, the pipelines should be permitted to retain these benefits.[100]
 
 
 52
 Order 499 is not objectionable merely because the rate base treatment given to working interest advances reflects a change of policy. The legal system does not compel rigidity, or bureaucratic inflexibility, least of all in an area like energy policy where flexibility may be essential in the public interest.[101] It is the genius of the administrative process to be flexible in response to observed development,[102] and an agency may 'switch rather than fight the lessons of experience.'[103]
 
 
 53
 However, the process of change in agency policy must be one that serves and does not erode the principle of reasoned decision making. We quote from an earlier decision of this court:
 
 
 54
 An agency's view of what is in the public interest may change, either with or without a change in circumstances. But an agency changing its course must supply a reasoned analysis indicating that prior policies and standards are being deliberately changed, not casually ignored, and if an agency glosses over or swerves from prior precedent without discussion it may cross the line from the tolerably terse to the intolerably mute.[104]
 
 
 55
 While here the agency's vice was not complete inattention to its prior policies, its discussion is so perplexing as to sow doubt whether this is a process of reasoned policy making, with a change in direction put in effect for a navigational objective, or the confusion of an agency that is rudderless and adrift.
 
 
 56
 Specifically, the FPC relied on the same policy--of providing equal treatment to pipeline producers and independent producers--to justify each of the three different positions taken in Orders 441, 465 and 499. In Order 441 the Commission relied on the policy of equal treatment (announced in Opinion 568) to withhold rate treatment from all working interest advances.[105] Order 465 interpreted Opinion 568 as resting on a desire to encourage 'intensified exploration by pipeline producers,'[106] and found that this desire, and the limited freedom of pipeline-affiliated producers to negotiate agreements to develop gas with others, made rate base treatment appropriate when a working interest was retained by a pipeline affiliate. In Order 499 the Commission pulled itself up by its bootstraps, and combined the change authorized in Order 465 and the policy of equal treatment of Opinion 568 to justify rate base treatment of advances resulting in working interests in independent producers.[107] Other than noting that the cost to the consumer was no greater, the FPC did not explain why the special considerations which arguably pertain to pipeline producers call for rate base treatment in the distinct case of working interest advances to independent producers.
 
 
 57
 And the FPC has in no way addressed itself to the basic issue raised by New York's contention, that the entire amount of the advance cannot properly be given rate base treatment as needed to induce development when part of the inducement of that advance was offset by the return to the pipeline of a part of the producer's working interest. There may be a reasoned response, but it has not been set forth by the Commission. If we should speculate that the FPC may be concerned by the administrative problem of quantifying the amount of advance ascribable to the working interest, then it will still have failed to give a reason for failure to provide some offset, against a cost of service calculated by applying fair rate of return to the entire amount of advances in rate base, for the monies actually recovered from working interests.
 
 
 58
 We cannot say on the basis of the present record that the Commission has given reasoned consideration to the treatment which should be given advances resulting in the acquisition of working interests.
 
 IV. CONCLUSION
 
 59
 We are mindful of the broad discretion accorded the Federal Power Commission in its efforts "to devise methods of regulation capable of equitably reconciling diverse and conflicting interests' . . . in this time of acute energy shortage.'[108] And we appreciate the difficulties involved in efforts to isolate the projected costs, and foreseeable benefits of one aspect of a multi-faceted approach to a natural gas crisis which has complex and interwined roots. Respect for the broad discretion of the FPC and appreciation of its difficult regulatory task impel us to uphold the Commission when it perceives the central problems, diligently seeks information to assist it in resolving those issues, and exercises its best judgment in the light of that information.[109] However, the reviewing court's duty to 'assure fidelity to the functions assigned to the regulatory agency by Congress' requires that it hold the agency to its duty to give reasoned consideration to the facts and issues material to its determinations.[110] There may be reason for the legislature to enact a deregulation for the natural gas industry, but so long as it prescribes a system of regulation by an agency subject to court review the courts may not abandon their responsibility by acquiescing in a charade or a rubber stamping of nonregulation in agency trappings.[111]
 
 
 60
 Our review of the FPC's advance payment orders and the arguments presented by the petitioner reveals that the Commission has failed to focus on significant issues presented in this case and has neglected to provide a reasoned and responsive explanation of its decision to continue the advance payments program and to expand the scope of the advances eligible for rate base treatment.
 
 
 61
 Petitioner urges that these inadequacies and the accelerating cost of the program to the gas consumer require that we couple any remand to the Commission with a prohibition against capitalization of certain types of advances pending Commission findings with substantial record support.[112] In response to this suggestion, it suffices to adapt the words of the Morgan cases,[113] and to say that a reviewing court should not view the agency with a hostile eye, like an 'intruder'; but rather consider that court and agency combined are 'collaborative instrumentalities of justice,' each acting in the performance of its duty with due regard to the appropriate functioning of the other in securing the statutory objectives. The distinctive authority of the courts of appeals to review the adequacy of record support for the agency's orders is coupled with an obligation to combine supervision with restraint.[114] It would not be in the public interest for us to exercise our judicial authority to scuttle in their entirety agency programs which may have certain aspects that provide a beneficent impact on the gas supply. It is our expectation that the Commission's on-going evaluation of the effectiveness of the program will enable it to give prompt and careful attention to the problem areas identified in this opinion.
 
 
 62
 The record is remanded for further proceedings not inconsistent with this opinion.[115]
 
 
 63
 So ordered.
 
 
 
 [1]
 Accounting and Rate Treatment of Advance Payments to Suppliers for Gas and Amending F.P.C. Form No. 2, Docket No. R--380, Order No. 410, 44 FPC 1142 (1970)
 
 
 [2]
 Other recent FPC actions include (1) setting area rates with higher ceiling prices for new and flowing gas and including contingent price escalations designed to prompt increased production, (2) adopting national base rates for new gas, (3) providing optional certification procedures under which gas from new wells may qualify for prices in excess of the area rate, and (4) employing special relief provisions to induce additional exploration. See notes 76--78 and accompanying text infra
 
 
 [3]
 New York filed its petition for review of Order 410 on March 5, 1971. See Public Service Comm'n v. FPC, 151 U.S.App.D.C. 307, 310, 467 F.2d 361, 364 (1972)
 
 
 [4]
 See Accounting and Rate Treatment of Advance Payments to Suppliers for Exploration and Lease Acquisition of Gas Producing Properties, Docket No. R--411, Order No. 441, 46 FPC 1178 (1971). Order 441 and a supplemental Order of Clarification and Denial of Rehearing or Modification, issued January 7, 1972, were lodged in No. 71--1161 pursuant to our grant of the FPC's January 17, 1972, Motion to Lodge Commission Orders. See Public Service Comm'n, supra note 3, 151 U.S.App.D.C. at 310, n. 12, 467 F.2d at 364 n. 12
 
 
 [5]
 151 U.S.App.D.C. at 317, 467 F.2d at 371
 
 
 [6]
 Accounting and Rate Treatment of Advances included in Account No. 166, Advances for Gas Exploration, Development and Production, Docket No. RM74--4, Order 499, issued December 28, 1973, Supp. JA 132; Accounting and Rate Treatment of Advance Payments included in Account 166, Advance Payments for Gas Development and Production, Docket No. R--411, Order No. 465, 48 FPC 1550 (1972). For a brief description of these two orders see text accompanying notes 32--41 infra
 
 
 [7]
 See Order 499, supra note 6, at 1, Attachment B, Schedule I; Supp. JA 132, 149
 
 
 [8]
 See Supplemental Brief for Petitioner New York at 6. New York's calculations were based on the FPC's data and cost assumptions
 
 
 [9]
 Data contained in Attachment B to Order 499 reveals that almost $400,000,000 were advanced between December 29, 1972 and July 30, 1973, compared with $156,000,000 advanced between November 10, 1971 and December 29, 1972. See Order 499, supra note 6, at Attachment B, Schedules II(b), II(c); Supp. JA 155--56
 
 
 [10]
 See Public Service Comm'n, supra note 3, 151 U.S.App.D.C. at 317, 467 F.2d at 371
 
 
 [11]
 Brief for Petitioner New York at 33. Specifically, New York contends: (1) that the data relied upon by the Commission do not demonstrate the effectiveness of advance payments in generating additional gas supplies; (2) that the Commission has failed to examine the adequacy of alternative methods of providing investment capital for gas development; (3) that the Commission's rate base treatment of those advances to producers which result in a working interest being accorded the pipelines is not supported by reasoned findings; (4) that the data advanced by the Commission do not justify rate base treatment of advances made for exploration; and (5) that the limitation of advances eligible for rate base treatment provided in the latest Commission order does not remedy the other defects in the program
 
 
 [12]
 See Supplemental Brief for Petitioner New York at 13--14; Petition for Rehearing of the Public Service Comm'n in Docket No. R--411, Order 465, at 5--6; JA 69, 73--74
 
 
 [13]
 Public Service Comm'n, supra note 3, 151 U.S.App.D.C. at 317, 467 F.2d at 371
 
 
 [14]
 Our disposition continues the advance payments program in effect during the agency's reconsideration of the record on remand. See text accompanying notes 112--14 infra. This approach has been utilized in prior cases. See, e.g., Portland Cement Ass'n v. Ruckelshaus, 158 U.S.App.D.C. 308, 486 F.2d 375 (1973) cert. denied, 417 U.S. 921, 94 S.Ct. 2628, 41 L.Ed.2d 226 (1974); International Harvester Co. v. Ruckelshaus, 155 U.S.App.D.C. 411, 478 F.2d 615 (1973)
 
 
 [15]
 44 FPC at 1143
 
 
 [16]
 Id. at 1146
 
 
 [17]
 Id
 
 
 [18]
 See Public Service Comm'n, supra note 3, 151 U.S.App.D.C. at 309, 467 F.2d at 363; 44 FPC at 1143, 1144
 
 
 [19]
 See JA 1
 
 
 [20]
 Accounting and Rate Treatment of Advance Payments to Suppliers for Gas, and Amending F.P.C. Form No. 2, Docket No. R--380, Order 410--A, 45 FPC 135 (1971)
 
 
 [21]
 Id
 
 
 [22]
 See 46 FPC 1178, 1180--81 (1971)
 
 
 [23]
 Id. at 1180. The Commission defined 'working interest' as an interest 'embodying operating rights and/or the right to share in production or revenue from the producing venture, so that its receipt of production or revenues will increase as the production or revenues from the producing venture increase, without any termination of such right to receive production or revenues after the return of the amount of any related advance payment.' Id
 
 
 [24]
 Id. at 1181
 
 
 [25]
 Id. at 1180
 
 
 [26]
 151 U.S.App.D.C. at 313, 467 F.2d at 367
 
 
 [27]
 JA 34
 
 
 [28]
 Id
 
 
 [29]
 Id. at 35
 
 
 [30]
 See Order 465, supra note 6, 48 FPC at 1551
 
 
 [31]
 Id. at 1550--51
 
 
 [32]
 Id. at 1554
 
 
 [33]
 Id. at 1554--55
 
 
 [34]
 Id. at 1554
 
 
 [35]
 JA 110
 
 
 [36]
 Order 499, supra note 6; Supp. JA 132
 
 
 [37]
 Id. at 5, 7; Supp. JA 136, 138
 
 
 [38]
 Id. at 6--7; Supp. JA 137--38
 
 
 [39]
 Id. at 8; Supp. JA 139
 
 
 [40]
 Accounting and Rate Treatment of Advances included in Account No. 166, Advance for Gas Exploration, Development and Production, Docket No. RM74--4, Order Denying Rehearing of Order No. 499, issued February 22, 1974, at 3; Supp. JA 173, 175
 
 
 [41]
 See Order 499, supra note 6, at 5; Supp. JA 136
 
 
 [42]
 Supp. Brief for Petitioner New York at 3
 
 
 [43]
 15 U.S.C. § 717r(b) (1970)
 
 
 [44]
 See Mobil Oil Corp. v. FPC, 417 U.S. 283, 94 S.Ct. 2328, 2345, 41 L.Ed.2d 72 (1974), quoting Permian Basin Area Rate Cases, 390 U.S. 747, 767, 88 S.Ct. 1344, 20 L.Ed.2d 312 (1968), quoting FPC v. Hope Natural Gas Co., 320 U.S. 591, 602, 64 S.Ct. 281, 88 L.Ed. 333 (1944)
 
 
 [45]
 390 U.S. 747, 791--92, 88 S.Ct. 1344, 1373, 20 L.Ed.2d 312 (1968)
 
 
 [46]
 Id. at 792, 88 S.Ct. at 1373
 
 
 [47]
 417 U.S. 283, 94 S.Ct. 2328, 41 L.Ed.2d 72 (1974)
 
 
 [48]
 'Whether on the record as a whole there is substantial evidence to support agency findings is a question which Congress has placed in the keeping of the Courts of Appeals.' Id. at 2346, quoting Universal Camera Corp. v. NLRB, 340 U.S. 474, 491, 71 S.Ct. 456, 95 L.Ed. 456 (1951); see Macdonald v. FPC, No, 73--1715, 164 U.S.App.D.C. 248, at 256, 505, F.2d 355, at 363 (1974)
 
 
 [49]
 147 U.S.App.D.C. 312, 325, 458 F.2d 731, 744 (1971), cert. denied, 405 U.S. 1074, 92 S.Ct. 1495, 31 L.Ed.2d 808 (1972)
 
 
 [50]
 159 U.S.App.D.C. 172, 208, 487 F.2d 1043, 1079 (1973), vacated and remanded sub nom. Shell Oil Co. v. Public Service Comm'n, 417 U.S. 964, 94 S.Ct. 3166, 41 L.Ed.2d 1136 (1974)
 
 
 [51]
 No. 73--1715, 164 U.S.App.D.C. 248, at 256, 505 F.2d 355, at 363 (1974)
 The three cases cited in the text are merely a sample of the cases articulating a basic tenet of the Rule of Law governing review of administrative actions. See also Greater Boston Television Corp. v. FCC, 143 U.S.App.D.C. 383, 392--93, 444 F.2d 841, 850--51 (1970), cert. denied, 403 U.S. 923, 91 S.Ct. 2229, 2233, 29 L.Ed.2d 701 (1971); WAIT Radio v. FCC, 135 U.S.App.D.C. 317, 320--321, 418 F.2d 1153, 1156--1157 (1969); City of Chicago v. FPC, 128 U.S.App.D.C. 107, 115, 385 F.2d 629, 637 (1967), cert. denied sub nom. Public Service Comm'n v. FPC, 390 U.S. 945, 88 S.Ct. 1028, 19 L.Ed.2d 1133 (1968).
 
 
 [52]
 See 94 S.Ct. at 2350
 
 
 [53]
 Id. at 2345
 
 
 [54]
 See id. at 2353, 2356
 
 
 [55]
 See id. at 2350--51
 
 
 [56]
 Id
 
 
 [57]
 Texas Gulf Coast Area Rate Cases, supra note 50, 159 U.S.App.D.C. at 196, 487 F.2d at 1067 (Leventhal, J., concurring in part and dissenting in part)
 
 
 [58]
 Permian Basin Area Rate Cases, 390 U.S. 747, 792, 88 S.Ct. 1344, 1373, 20 L.Ed.2d 312 (1968)
 
 
 [59]
 See Accounting and Rate Treatment of Advances included in Account 166, Advances for Gas Exploration, Development and Production, Docket No. RM74--4, Renotice of Proposed Rulemaking and Request for Comments, issued October 31, 1973, at 1, Supp. JA 116; Accounting and Rate Treatment of Advance Payments Included in Account 166, Advance Payments for Gas Development and Production, Docket No. R--411, Renotice of Proposed Rulemaking and Request for Comments, issued July 3, 1972, at 1, JA 34
 
 
 [60]
 See Order 465, supra note 6, at Attachment D, JA 61--65
 
 
 [61]
 48 FPC at 1553. (emphasis in the original) (footnotes omitted)
 
 
 [62]
 Petition for Rehearing of the Public Service Comm'n, supra note 12, at 3, JA 71. (emphasis in the original)
 
 
 [63]
 See Application of Mobil Oil Corp. for Rehearing of Order Amending Regulations Under the Natural Gas Act, Uniform System of Accounts for Class A and Class B Natural Gas Companies and Annual Report Form No. 2, Docket No. R--411, Order 465, at 13, JA 81, 93
 
 
 [64]
 See Petition for Rehearing, supra note 12, at 4--5, JA 72--73; Application of Mobil Oil Corp., supra note 63, at 14, JA 94
 
 
 [65]
 See Order of Clarification and Denial of Rehearing or Modification, Docket No. R--411, issued February 27, 1973, at 3--4, JA 110, 112--13
 
 
 [66]
 Id. at 4, JA 113
 
 
 [67]
 See Comments of the Public Service Comm'n on the State of New York, Docket No. RM74--4, at 3--5, Supp. JA 120, 122--24
 
 
 [68]
 See Order 499, supra note 6, at 3, JA 134
 
 
 [69]
 See id. at 4--5, JA 135--36
 
 
 [70]
 See id. at 5, JA 136
 
 
 [71]
 See Public Service Comm'n, supra note 3, 151 U.S.App.D.C. at 317, 467 F.2d at 371
 
 
 [72]
 See Order 499, supra note 6, at 4--5, JA 135--36
 
 
 [73]
 New York presents a similar argument in challenging the Commission's decision in Order 465 to allow rate base treatment of advances for exploration. See Brief for Petitioner New York at 28--29. The Commission found that advances for exploration and lease acquisition had 'resulted in significant production activity,' but relied on comments, indicating that advances for lease acquisition had inflated lease prices, to deny those advances rate base treatment. See 48 FPC at 1554. New York contends that the failure to isolate the impact of advances for exploration undermines the FPC's conclusion that they prompted sufficient production to merit inclusion in the rate base. While we believe that it would be preferable to focus directly on the exploration advances, we do not find that the agency's course of examining the impact of the general category of advances, see text at note 60 supra, and then excluding a subcategory of advances (lease acquisition) on the basis of overriding countervailing
 effects was impermissible in view of the data available to the Commission. However, the Commission's approach to advances for exploration, like its justification of the entire program, suffers from the unsubstantiated assumption that advances were responsible for all of the gas associated with the payments.
 
 
 [74]
 See 94 S.Ct. at 2350--51 & n. 50
 
 
 [75]
 Cf. Macdonald v. FPC, No. 73--1715, 164 U.S.App.D.C. 248, at 254, 256, 258--259, 505 F.2d 355, at 361, 363, 365--366 (1974) (remanding case to FPC for further proceedings because of insufficient cost data in the record to support the Commissions determination that the producer would not earn excessive profits at the special relief price of 30.25cents per Mcf granted on both flowing and newly discovered gas for a particular region)
 
 
 [76]
 See, e.g., Permian Basin Area Rate Proceeding, II, 50 FPC 390 (1973); Other Southwest Area Rate Proceeding, 46 FPC 900 (1971); Southern Louisiana Area Rate Proceeding, II, 46 FPC 86 (1971); Texas Gulf Coast Area Rate Proceeding, 45 FPC 674 (1971)
 
 
 [77]
 See 94 S.Ct. at 2350
 
 
 [78]
 See Optional Procedure for Certificating New Producer Sales of Natural Gas, Docket No. R--441, Order No. 455, 48 FPC 218 (Aug. 3, 1972) (establishing the optional certification under which gas from wells sunk after April 6, 1972, may qualify for rates substantially in excess of prevailing area rates). That order had recently been upheld, with minor exceptions, by this court in Moss v. FPC, 164 U.S.App.D.C. 1, 502 F.2d 461 (1974) (upholding the optional pricing procedure in new Section 2.75 of the Commission's General Policy and Interpretations with the exception of subsection (e) which was invalidated)
 The FPC first employed the optional pricing procedure in approving contracts between three producers and Tennessee Gas Pipeline Co. establishing a basic rate which exceeded the area ceiling by 19cents per Mcf and included additional annual escalations. See Belco Petroleum Corp., Docket No. CP73--293, Opinion No. 659 (May 39, 1973), reversed and remanded, Consumers Union v. FPC, 166 U.S.App.D.C. ---, 510 F.2d 656 (1974) (decision based on FPC's use of faulty cost estimate ranges and test year). The Commission has sanctioned higher prices under the optional pricing policy in a number of other instances. See Comptroller General of the United States, Need for Improving the Regulation of the Natural Gas Industry and Management of Internal Operations 28 (1974) (between August 25, 1972, and March 5, 1974, 24 of the 77 applications filed by producers for gas sales under the optional certificate procedures were granted, 39 were still pending, 11 had been withdrawn and 3 had been denied).
 Another action elevating the level of rates above that prevailing in area determinations was taken on June 21, 1974, when Opinion No. 699 established a single national base rate of 42cents per Mcf for jurisdictional sales of gas from wells drilled after January 1, 1973, and for gas first dedicated to the interstate market pursuant to contracts executed on or after January 1, 1973. The national rate is designed to provide 'the incentives to stimulate and encourage the unprecedented exploration and development efforts that will be necessary to find and produce the requisite level of new natural gas supplies.' Opinion No. 699, at 24. On December 4, 1974, the Commission issued an order increasing the national rate for such gas to 50cents per Mcf. Washington Post, Dec. 6, 1974, at 1, col. 2--4.
 These national rate base orders were not in existence at the time of the latest action under review, Order 499 in which the FPC denied rehearing on February 22, 1974. But it should be taken into account in the proceedings on remand now ordered by this court.
 The Commission has also utilized its power to grant special relief from area rates to induce further gas exploration and development. See George Mitchell & Associates, Opinion No. 649, issued February 21, 1973, remanded for further proceedings, Macdonald v. FPC, supra note 75.
 
 
 [79]
 See Brief for Petitioner New York at 19--20 & n. 16
 
 
 [80]
 See 46 FPC at 1179. See also Macdonald, supra note 75, 164 U.S.App.D.C. at 257, 505 F.2d at 364 (noting that the area rate structures have been set 'to provide producers with a necessary but not excessive profit incentive for gas exploration.')
 
 
 [81]
 See 46 FPC at 1180
 
 
 [82]
 Order of Clarification, supra note 65, at 4; JA 113
 
 
 [83]
 This FPC order, as well as all of the others dealing with rate base treatment of advance payments, contains no discussion of the nature and extent of the capital formation problems of gas producers or the probable impact of various programs, see notes 76--78 supra and accompanying text on the capital position of the producers. However, there is some indication in the record that small producers face capital shortages for which advance payments provide an important source of relief. See, e.g., Order 465, 48 FPC at 1551 (citing comments filed by pipelines and small producers); Statement of the Independent Petroleum Association of America in Docket No. R--466 (sic)), at 3--4; JA 106, 107
 
 
 [84]
 See Comments of the Public Service Comm'n, supra note 67, at 5, 6--7; Supp. JA 124, 125--26
 
 
 [85]
 See generally Orders 499 and 465, supra note 6
 The FPC's brief seems to place considerable emphasis on the steps taken to assure that all interested parties have the opportunity to present their views of the program and to comment on the data compiled by the Commission. See Brief for Respondent at 23--24. However, our prior decision contemplated that the Commission would do more than provide a forum for further debate. It assumed that the FPC would listen carefully to the arguments advanced, collect any necessary supplemental data, and subject the whole to 'meaningful review, analysis, and evaluation' before extending the advance payments program beyond December 31, 1972. See 151 U.S.App.D.C. at 317, 467 F.2d at 371.
 
 
 [86]
 See Macdonald, supra note 75, 164 U.S.App.D.C. at 256, 505 F.2d at 363
 
 
 [87]
 See Order 499, supra note 6, at 5, Supp. JA 136; Order of Clarification, supra note 65, at 3--4, JA 112--13
 
 
 [88]
 Accounting and Rate Treatment of Advances included in Account No. 166, Advance for Gas Exploration, Development and Production, Docket No. RM74--4, Order Denying Rehearing of Order No. 499, issued Feb. 22, 1974, at 2; Supp. JA 173, 174
 
 
 [89]
 See Consumers Union, supra note 84, at 9
 
 
 [90]
 See Comments of Public Service Comm'n, supra note 67, at 5; Supp. JA 124 (quoting statement of Tennessee Gas Pipe Line Vice President Rowe)
 
 
 [91]
 See id. at 6; Supp. JA 125
 
 
 [92]
 See Order 499, supra note 6, at Attachment B, Schedules I(a), I(b), I(c), Supp. JA 150--52 (Southern Louisiana Area accounted for $975,000,000 of the $1,269,000,000 total advances committed); Southern Louisiana Area Rate Proceeding, 40 FPC 530, 545 (1968)
 
 
 [93]
 See 46 FPC at 1180
 
 
 [94]
 See 48 FPC at 1554--55
 
 
 [95]
 See Order 499, supra note 6, at 6--7; Supp. JA 137--38
 
 
 [96]
 Supplemental Brief for Petitioner New York at 21--22
 
 
 [97]
 See Comments of Public Service Comm'n, supra note 67, at 7--8, Supp. JA 126--27
 
 
 [98]
 46 FPC at 1181
 
 
 [99]
 Id
 
 
 [100]
 Order 499, supra note 6, at 7; Supp. JA 138
 
 
 [101]
 See City of Chicago v. FPC, supra note 51, 128 U.S.App.D.C. at 115, 385 F.2d at 637
 
 
 [102]
 See American Airlines, Inc. v. CAB, 123 U.S.App.D.C. 310, 359 F.2d 624 (en banc), cert. denied, 385 U.S. 843, 87 S.Ct. 73, 17 L.Ed.2d 75 (1966)
 
 
 [103]
 See New Castle County Airport Comm'n v. CAB, 125 U.S.App.D.C. 268, 270, 371 F.2d 733, 735 (1966), cert. denied, 387 U.S. 930, 87 S.Ct. 2052, 18 L.Ed.2d 991 (1967)
 
 
 [104]
 Greater Boston Television Corp. v. FCC, supra note 51, 143 U.S.App.D.C. at 394, 444 F.2d at 852 (footnotes omitted)
 
 
 [105]
 See 46 FPC at 1180, referring to Pipeline Production Area Rate Proceeding, Opinion No. 568, Docket No. RP66--24, 42 FPC 738 (1969), aff'd sub nom. City of Chicago v. FPC, supra note 49
 
 
 [106]
 See 48 FPC at 1555
 
 
 [107]
 See Order 499, supra note 6, at 6--7, Supp. JA 137, 138
 
 
 [108]
 Mobil Oil v. FPC, 417 U.S. 283, 94 S.Ct. 2328, 2356, 41 L.Ed.2d 72 (1974), quoting Permian Basin Area Rate Cases, 390 U.S. 747, 767, 88 S.Ct. 1344, 20 L.Ed.2d 312 (1968)
 
 
 [109]
 See, e.g., Greater Boston Television Corp., v. FCC, supra note 51, 143 U.S.App.D.C. at 393, 444 F.2d at 851
 
 
 [110]
 Texas Gulf Coast Area Rate Cases, supra note 50, 159 U.S.App.D.C. at 208--09, 487 F.2d at 1079--80
 
 
 [111]
 See id., 487 F.2d at 1079--80; Texaco v. FPC, 154 U.S.App.D.C. 168, 171--72, 474 F.2d 416, 419--20 (1972), vacated and remanded, 417 U.S. 380, 94 S.Ct. 2315, 41 L.Ed.2d 141 (1974)
 
 
 [112]
 See Supplemental Brief for Petitioner New York at 23. New York requests that any remand be accompanied with a prohibition of rate base treatment of future advances involving (1) offshore areas, (2) acquisition of a working interest, (3) exploration advances, and (4) agreements which do not require all gas to the dedicated to the advancing pipeline
 
 
 [113]
 United States v. Morgan, 313 U.S. 409, 422, 61 S.Ct. 999, 85 L.Ed. 1429 (1941) (Justice Frankfurter); United States v. Morgan, 307 U.S. 183, 191, 59 S.Ct. 795, 83 L.Ed. 1211 (1939) (Justice Stone)
 
 
 [114]
 See Greater Boston Television Corp. v. FCC, supra note 51, 143 U.S.App.D.C. at 393--94, 444 F.2d at 851--52
 
 
 [115]
 In Order No. 499 the Commission announced a general policy of limiting amounts includable in the rate base to the producer's total costs for exploration, development and production incurred within a reasonable time after the date of the advances. See note 39 and accompanying text supra. We commend the Commission's attempt to place an outer bound on the program by denying rate treatment to excessive advances. However, even if this general policy were refined and enforced, it would not justify the continuation of the program in the absence of substantial record support